**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHERN CALIFORNIA RIVER
WATCH, a non-profit corporation;
ROBERT G. EVANS,
        *Plaintiffs-Appellants,*

v.

CARL WILCOX; GENE COOLEY;
ROBERT FLOERKE; WILLIAM R.
SCHELLINGER; FRANK H.
SCHELLINGER, individually and
doing business as Schellinger
Brothers; SCOTT SCHELLINGER,
        *Defendants-Appellees.*

No. 08-15780

D.C. No.
3:06-CV-06685-
CRB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
July 14, 2009—San Francisco, California

Filed August 25, 2010
Amended January 26, 2011

Before: Dorothy W. Nelson, William A. Fletcher, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

1617

## COUNSEL

Jack Silver, Law Office of Jack Silver, Santa Rosa, California, for plaintiffs-appellants Northern California River Watch and Robert G. Evans.

Christopher J. Carr, Shaye Diveley, Morrison & Foerster LLP, San Francisco, California, for defendants-appellees William R. Schellinger and Frank H. Schellinger, dba Schellinger Brothers, and Scott Schellinger.

Edmund G. Brown Jr., Attorney General of the State of California, James Humes, Chief Deputy Attorney General, Matt Rodriguez, Chief Assistant Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, Robert W. Byrne, Supervising Deputy Attorney General, Michael W. Neville, Deputy Attorney General, San Francisco, California, for defendants-appellees Carl Wilcox, Gene Cooley, and Robert Floerke.

Ronald J. Tenpas, Assistant Attorney General, Andrew Mergen, Attorney, Ellen Durkee, Attorney, Bradford T. McLane,

Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC, David Gayer, of Counsel, Office of the Solicitor, United States Department of the Interior, Washington, DC, for amicus curiae United States of America.

---

## ORDER

The unopposed motion of the United States, as *amicus curiae,* to clarify the court's Opinion is granted as follows:

The Opinion, filed on August 25, 2010, and reported at 620 F.3d 1075 (9th Cir. 2010), is amended as follows:

At Slip Op. 12801, 620 F.3d at 1089-90, the first full paragraph beginning with <the broad sweep> and ending with <a majority opinion)).> is deleted and replaced with:

> The broad sweep of the Corps' authority to regulate was sharply debated in *Rapanos*, in which the Court split 4-1-4 with regard to the limits of the Corps' regulatory jurisdiction of non-adjacent wetlands on privately-owned land. The plurality opinion characterized the Corps' ability to regulate as overly expansive, noting that "the Corps consciously sought to extend its authority to the farthest reaches of the commerce power." *Rapanos*, 547 U.S. at 738 (citing 42 Fed. Reg. 37,122, 37,127 (1977)). Even Justice Kennedy's concurrence is based on his concern about "the potential over-breadth of the Corps' regulations." *Id.* at 782 (holding that the Corps has jurisdiction on the basis of adjacency to regulate wetlands adjacent to navigable-in-fact waters, but "must establish a significant nexus on a case-by-case basis" if the wetlands are adjacent to nonnavigable tributaries). *In City of Healdsburg*, 496 F.3d at 999-

1000, the court found that Justice Kennedy's concurrence in *Rapanos* "provides the controlling rule of law for our ase." We did not, however, foreclose the argument that Clean Water Act jurisdiction may also be established under the plurality's standard.

An Amended Opinion is filed concurrently with this Order.

## OPINION

PAEZ, Circuit Judge:

Robert Evans and Northern California River Watch ("River Watch") appeal the district court's grant of summary judgment to the Schellinger defendants and three employees of the California Department of Fish and Game (collectively "Defendants").[1] River Watch contends that Defendants violated the Endangered Species Act ("ESA"), codified at 16 U.S.C. § 1531 *et seq.* Specifically, River Watch argues that Defendants dug up and removed the endangered plant species, Sebastopol meadowfoam (*Limnanthes vinculans*) and, therefore, violated § 9 of the ESA, which makes it unlawful for anyone to "take" a listed plant on areas under federal jurisdiction.[2] *See* 16 U.S.C. § 1538(a)(2)(B).

The district court granted Defendants' motion for summary judgment, concluding that River Watch could not establish, as a matter of law, that the areas in which the Sebastopol mead-

---

[1] The Schellinger defendants include William and Frank Schellinger, individually and doing business as Schellinger Brothers, and Scott Schellinger, son of defendant William Schellinger. The California Department of Fish and Game employee defendants are Carl Wilcox, Gene Cooley, and Robert Floerke.

[2] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

owfoam plants were growing were "areas under Federal jurisdiction." On appeal, we consider the meaning of the term "areas under Federal jurisdiction" as used in ESA § 9. River Watch argues that the term encompasses privately-owned wetlands adjacent to navigable waters that have been designated as "waters of the United States" by the Army Corps of Engineers. The United States, representing the interests of the Department of the Interior's Fish and Wildlife Service as amicus curiae, argues that § 9 is ambiguous, that we must apply the deference principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984), and that under *Chevron* the privately-owned land at issue in this case is not an "area[ ] under Federal jurisdiction."

Although we agree that the term "areas under Federal jurisdiction" is ambiguous, we are not convinced that the U.S. Fish and Wildlife Service ("FWS"), the agency with rule making authority, has interpreted the term. Nonetheless, for the reasons set forth in this opinion, we hold that "areas under Federal jurisdiction" does not include the privately-owned land at issue here. We therefore agree with the district court's ultimate legal conclusion in this case and affirm the grant of summary judgment to Defendants.[3]

## I.   Factual and Procedural Background

William and Frank Schellinger are brothers and business partners who seek to develop 21 acres of private property in Sebastopol, California. These 21 acres ("the Site") are comprised of grasslands containing seasonal vernal pools, wetlands, seasonal creeks, vernal pools, and vernal swales. *N. Cal. River Watch v. Wilcox*, 547 F. Supp. 2d 1071, 1072-73 (N.D. Cal. 2008). The Site sits adjacent to the Laguna de Santa Rosa, a tributary of the Russian River. *Id.* at 1073; *see also Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1139 (9th Cir. 1998). The Russian

---

[3]We have jurisdiction pursuant to 28 U.S.C. § 1291.

River, as the parties acknowledge, is a navigable water of the United States. *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 996 (9th Cir. 2007). "Navigable waters" are defined in the Clean Water Act ("CWA") as "waters of the United States," 33 U.S.C. § 1362(7), which include wetlands adjacent to navigable waters. 33 C.F.R. § 328.3(a)(7); *see also Rapanos v. United States*, 547 U.S. 715, 782 (2006).

In the course of the Schellingers' efforts to develop the Site in 2003, the United States Army Corps of Engineers ("the Corps") designated 1.84 acres of the Site as wetlands subject to the permitting requirements of the CWA, due to their adjacency to the Laguna de Santa Rosa.[4] *Wilcox*, 547 F. Supp. 2d at 1073. In other words, under the CWA, this portion of the Site is considered a "navigable water." The CWA prohibits discharges of pollutants—including dredged soil, rock, sand, and cellar dirt—into the "navigable waters of the United States," unless one receives a special permit. 33 U.S.C. §§ 1311(a), 1344, 1362(6); *City of Healdsburg*, 496 F.3d at 995. The Schellingers applied for such a permit under § 401 and § 404 of the CWA, because their development plans included filling in and paving over parts of the Site designated as wetlands.

In April 2005, amateur naturalist Robert Evans was walking with his dog along one of the paths on the Site, when he found what he believed was the endangered plant species Sebastopol meadowfoam on the Site's wetlands.[5] *See* 50

---

[4]The fact that the Corps' designation expired in 2006 is of no consequence to our decision, because land either is or is not an "adjacent wetland," and a private property owner must comply with the CWA's permitting requirements on adjacent wetlands regardless of whether they have been so designated by the Corps. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985) (holding that the Corps acted reasonably when it defined "waters of the United States" to include "adjacent wetlands" and that the Corps could sue a developer who filled in adjacent wetlands on his own property without a permit).

[5]Evans has led hikes around the Laguna de Santa Rosa, helped develop historical data of the tributary for the Laguna de Santa Rosa website, and

C.F.R. § 17.12 (listing Sebastopol meadowfoam as an endangered plant species). A local biology professor determined that, although Evans had identified only the common meadowfoam, there were Sebastopol meadowfoam plants on the Site's wetlands. The professor notified the relevant federal and state authorities about the presence of the endangered plants. A biologist from the California Department of Fish and Game ("CDFG") also surveyed the Site and confirmed the presence of Sebastopol meadowfoam, noting that the plants were healthy and that there was no evidence of ground disturbance or replanting.

After learning of the discovery of Sebastopol meadowfoam, CDFG Habitat Conservation Manager Carl Wilcox, CDFG biologist Gene Cooley, and Project Manager for the Site's development Scott Schellinger, visited the Site in order to further investigate the presence of the plants. *Wilcox*, 547 F. Supp. 2d at 1073. Wilcox confirmed that the vegetation was the endangered plant species Sebastopol meadowfoam. In examining the plants to determine whether they were rooted in the soil and thus naturally occurring, Wilcox lifted the plants, along with their substrates, out of the wetland. Because the CDFG employees suspected that the plants were not naturally occurring,[6] Cooley later returned to the Site to gather evidence. *Wilcox*, 547 F. Supp. 2d at 1073. Upon his return visit, he removed the Sebastopol meadowfoam plants, placed them in plastic bags, and transported them to the local CDFG office, where he placed most of the plants in an evidence locker. *Id.* at 1073, 1079.

---

for the past 20 years has enjoyed recreational activities in and around the tributary. Evans is a past president of the Laguna de Santa Rosa Foundation, and he is a member of the Laguna Preservation Council, the Northern California River Watch, and a number of other environmental organizations.

[6]In the district court, the Schellingers alleged that the plants were illegally transplanted to the Site in an effort to delay their development plans. Although this issue is disputed by the parties, it is irrelevant to our review.

River Watch, in response to the discovery of the Sebastopol meadowfoam and the Schellingers' continuing efforts to develop the Site, filed a complaint in 2006 in the Northern District of California. *Id.* at 1073. River Watch alleged that the CDFG employees' treatment and removal of the plants violated ESA § 9(a)(2)(B), and named Wilcox, Cooley, and Robert Floerke (another CDFG employee) as defendants.[7] *See id.* River Watch sought declaratory and injunctive relief.

Under § 9(a)(2)(B), it is unlawful to remove, damage, or destroy an endangered plant species in "areas under Federal jurisdiction." 16 U.S.C. § 1538(a)(2)(B). Although the Site is privately owned, River Watch alleges that the Sebastopol meadowfoam was found in an "area[ ] under Federal jurisdiction," because it was found in the portion of the Site that was designated as adjacent wetlands under the CWA. Therefore, River Watch argues that Defendants violated § 9 when they removed the Sebastopol meadowfoam plants.

Defendants filed a motion for summary judgment in which they argued that the term "areas under Federal jurisdiction" was limited to land owned by the Federal government. *Wilcox*, 547 F. Supp. 2d at 1075. The district court denied their motion, ruling that "areas under Federal jurisdiction" was not so limited. *Id.* Following discovery, both parties moved for summary judgment, and the district court granted Defendants' motion, concluding that River Watch could not prevail on its § 9(a)(2)(B) claims because, as a matter of law, River Watch could not establish that the wetlands qualified as "areas under Federal jurisdiction."[8] *Id.* at 1075-76, 1078. River Watch appealed.

---

[7] In September 2007, River Watch filed a second amended complaint adding the Schellingers as defendants and alleging that the Schellingers "solicited or otherwise assisted" in removing the plants from the Site in violation of ESA § 9(g).

[8] River Watch also alleged that Defendants violated ESA § 9(a)(2)(B)'s third prong, which makes it unlawful to "remove, cut, dig up, or damage

## II.   Discussion

Because the parties agree that there are no genuine issues of material fact, the predicate legal issue is ripe for summary judgment.[9] Fed. R. Civ. P. 56(c). The sole question we must address is whether the land upon which the Sebastopol meadowfoam populations were discovered and removed is, as a matter of law, an "area[ ] under Federal jurisdiction" for purposes of ESA § 9(a)(2)(B), 16 U.S.C. § 1538(a)(2)(B).

Both River Watch and Defendants argue that the text of § 9(a)(2)(B) is clear and that it plainly supports their respective positions. River Watch argues that the term "areas under Federal jurisdiction" plainly "includes all waters of the United States subject to the jurisdiction of the federal agencies, federal courts and the federal environmental protection laws of the United States," such as the wetlands here. Defendants argue that the statutory text is plainly limited to land that is owned by the federal government. Finally the United States, as amicus curiae, urges us to conclude that the statutory text is ambiguous and that the FWS's construction of the ESA is entitled to *Chevron* deference. The United States interprets

---

or destroy any such species on any other area in knowing violation of any law or regulation of any State . . . ." 16 U.S.C. § 1538(a)(2)(B); *see Wilcox*, 547 F. Supp. 2d at 1075. The district court found that no reasonable trier of fact could find that Defendants had acted in knowing violation of state law, because they were "indisputably acting for a law enforcement purpose or, at least, not in *knowing* violation of state law." *Id.* at 1078. River Watch does not challenge the district court's ruling on this issue.

Although not specifically mentioned in the district court's ruling, River Watch's allegations that the Schellingers violated ESA § 9(g), by "attempting to commit, soliciting another to commit, and causing to be committed, offenses defined in ESA § 9" are dependent on whether the Sebastopol meadowfoam plants were located on "areas under Federal jurisdiction."

[9] We review de novo the district court's grant of summary judgment. *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007).

the FWS's construction of "areas under Federal jurisdiction" to include federal lands owned in fee simple, as well as "federal property interests such as conservation easements, leasehold estates, and special management areas." "[A]reas under Federal jurisdiction" does not include, the United States argues, privately-owned lands that are merely subject to regulatory jurisdiction under a federal statute. Finally, the United States argues that according to the FWS's interpretation, "ESA section 9(a)(2)(B) [does not] regulate actions that harm a listed plant species on private property unless that action occurs in knowing violation of a state law or regulation or in the course of a violation of a state criminal trespass law."

We begin our analysis with the "familiar two-step procedure" laid out in *Chevron*. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005). At step one, we evaluate whether Congressional intent regarding the meaning of the text in question is clear from the statute's plain language. *Id.* If it is, we must give effect to that meaning. *Id.* If the statute is ambiguous, and an agency purports to interpret the ambiguity, prior to moving on to step two, we must determine whether the agency meets the requirements set forth in *Mead*: (1) that Congress clearly delegated authority to the agency to make rules carrying the force of law, and (2) that the agency interpretation was promulgated in the exercise of that authority. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *Marmolejo-Campos v. Holder*, 558 F.3d 903, 908 (9th Cir. 2009) (en banc). If both of these requirements from *Mead* are met, then we proceed to step two. Under step two, we must determine if the agency's interpretation of the statute is "a reasonable policy choice for the agency to make." *Brand X*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 845).

River Watch and Defendants implicitly argue that our analysis is limited to step one of the *Chevron* framework. The United States, however, argues that "areas under Federal jurisdiction" is ambiguous and that, for purposes of step one,

Congress delegated authority to the FWS to interpret the term. Proceeding to *Chevron* step two, the United States argues that the FWS has interpreted the term in three rules that list endangered plant species under the ESA and in a guidance manual. The United States argues that we should, therefore, defer to the FWS's interpretation. We examine the parties' arguments below, applying *Chevron*'s analytical framework.

### A.   *Chevron* Step One

**[1]** In determining whether "areas under Federal jurisdiction" under § 9 include "waters of the United States," and thus the wetlands on the Site, we must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1236 (9th Cir. 2005). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

To determine if Congress has spoken directly to the meaning of "areas under Federal jurisdiction" in the ESA, "we employ the traditional tools of statutory construction." *Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031 (9th Cir. 2007) (quoting *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1165 (9th Cir. 2001) (internal quotations omitted)).

> These tools of construction require us first to engage in a textual analysis of the relevant statutory provisions and to read the words of statutes in their context and with a view to their place in the overall statutory scheme. If the proper interpretation is not clear from this textual analysis, the legislative history offers valuable guidance and insight into Congressional intent. However, it is well established that legislative history which does not demonstrate a

clear and certain congressional intent cannot form the basis for enjoining regulations.

*Id.* (quoting *Student Loan Fund*, 272 F.3d at 1165 (citations and quotation marks omitted)).

### 1.  *Textual Analysis*

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). Section 9 prohibits "any person subject to the jurisdiction of the United States" from committing certain acts against or relating to endangered or threatened fish and wildlife or plant species. *Id.* § 1538(a). Section 9(a)(2) describes the prohibitions relating to endangered plants. *Id.* The prohibitions at issue here are found at § 9(a)(2)(B), which states that it is unlawful to:

> remove and reduce to possession any [endangered species of plants] from *areas under Federal jurisdiction*; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law.

*Id.* § 1538(a)(2)(B) (emphasis added).

**[2]** The meaning of "areas under Federal jurisdiction" is not immediately clear, nor is it explicitly defined in the ESA. "Jurisdiction, it has been observed, is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (internal quotation marks and citations omitted). Review of the specific context in which the term is used, and the broader context of the statute as a whole, also

fails to elucidate the meaning of the phrase. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

River Watch argues that when privately-owned lands are subject to the jurisdiction of the CWA, as are the wetlands on the Site, they should be considered "areas under Federal jurisdiction." River Watch's argument is not without some legal support. It is well established that the Corps may regulate "wetlands adjacent to navigable waters and their tributaries." *City of Healdsburg*, 496 F.3d at 997 (citing *Riverside Bayview Homes, Inc.*, 474 U.S. 121). Indeed, the Corps calls wetlands subject to the CWA, "jurisdictional wetlands," *Rapanos*, 547 U.S. at 763, and the Corps makes an "assertion of jurisdiction" when enforcing the CWA. *See City of Healdsburg*, 496 F.3d at 1000. Waters subject to the jurisdiction of the CWA are also referred to as "jurisdictional waters." *See Defenders of Wildlife v. Bernal*, 204 F.3d 920, 923 (9th Cir. 2000). River Watch therefore contends that, when the Corps asserts regulatory jurisdiction by deeming private land an adjacent wetland under the CWA, the private land becomes an "area[ ] under Federal jurisdiction," which is then subject to regulation by the FWS under § 9(a)(2)(B).

In addition, River Watch argues that the only way the ESA can maintain internal consistency is if areas that are protected under ESA § 7 are also protected under § 9. Section 7 requires agencies to consult with the FWS prior to authorizing any action that may affect an endangered species. *See* 16 U.S.C. § 1536(a)(2). Thus, when a private party like the Schellingers applies for a permit under § 401 and § 404 of the CWA, the Corps must confer with the FWS prior to granting a permit to discharge pollutants into a navigable water like an adjacent wetland. *See id.* River Watch argues that, if "areas under Federal jurisdiction" in § 9 is not read to apply to the privately-owned adjacent wetlands regulated by the CWA, then § 9 would have the perverse effect of allowing (and perhaps incentivizing) a private landowner to circumvent ESA § 7's

protections by destroying endangered plants on his property before requesting a permit under the CWA.

We are not persuaded that a plain reading of the text supports River Watch's arguments. It is clear from the statutory text that Congress did not intend for § 7 and § 9 to be coextensive. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 702-03 (1995). We cannot discern from the text of the ESA why Congress crafted § 9 to leave the gap in coverage identified by River Watch. We are certain, however, that Congress has not unambiguously manifested its intent to adopt River Watch's view. Therefore, we proceed to examine the legislative history of the ESA to see if it "offers valuable guidance and insight into Congressional intent." *See Resident Councils of Wash.*, 500 F.3d at 1031 (quoting *Student Loan Fund*, 272 F.3d at 1165 (quotation marks and citations omitted)).

### 2. Legislative History

"[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186 (1969)). Here, there are only two committee reports that discuss the extension of the ESA's protections to plants: (1) a House Conference Report that preceded the passage of the 1982 Amendments to the ESA, and (2) a Senate Report that preceded the passage of the 1988 Amendments to the ESA.

The 1982 House Conference Report provides virtually no insight into Congress' intent in passing the amendments. The report states only that the bill "amends section 9 of the Act by adding a provision to prohibit the removal and reduction to possession of any endangered plant that is on Federal land." H.R. Rep. No. 97-835, at 35 (1982), *reprinted in* 1982

U.S.C.C.A.N. 2860, 2876. Defendants argue that the use of the term "federal land" in lieu of "areas of Federal jurisdiction" signals Congress' clear intent that the terms are equivalent. They additionally argue that the term "federal land" means lands owned by the federal government. Neither the report nor the proposed bill defines "federal land," and we agree with the district court that the term "federal land" is ambiguous and could arguably include lands over which the federal government maintains some interest, such as conservation easements, leasehold estates, special management areas, and jurisdictional wetlands. *See Wilcox*, 547 F. Supp. 2d at 1076. Furthermore, "federal land" is not clearly the same thing as "areas under Federal jurisdiction." Even if "federal land" was unambiguous, it would not necessarily aid our interpretation here.

The 1988 Senate Report provides a bit more substance, stating that at present the ESA "is deficient in the level of protection provided for plants, which is insufficient and lags behind that provided for animals." Senate Comm. on Env't & Pub. Works, S. Rep. 100-240, at 4 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2700, 2703. The 1988 Senate Report, like the 1982 House Conference Report, uses the term "federal land" in lieu of the statutory text "areas under Federal jurisdiction."[10]

---

[10]River Watch asserts that it is inappropriate to consider the 1988 Senate Report as it is "subsequent legislative history." River Watch is mistaken. First, the 1988 Amendments added the "maliciously damage or destroy" provision to § 9(a)(2)(B); consequently, the Senate Report is not "subsequent to," but rather concurrent with that provision. Further, because that provision mirrors the scope of the "remove and reduce to possession" provision, which was enacted in 1982, by referring to its jurisdictional limitation ("on any such area"), the 1988 Report's analysis may be properly consulted to discern the intent behind the "remove and reduce to possession" provision as well. Finally, as Defendants note, *Solid Waste Agency v. U.S. Army Corps of Engineers* expresses concern over relying on subsequent legislative history to contradict the "plain text and import" of a statutory provision. 531 U.S. 159, 170 (2001). Here, however, we look to the 1988 report in order to gain insight into the pertinent text of § 9(a)(2)(B), which has no plain meaning.

*Id.* at 12, *reprinted in* 1988 U.S.C.C.A.N. at 2711-12. The Senate Report further noted that "[a]dditional protection for endangered plants on private and other non-federal lands is also needed" and that "[t]he Act currently offers no protection for endangered plants on these lands." *Id.* Although that text suggests that "areas under Federal jurisdiction" is limited to "federal land," and that "federal land" does not include "private and other non-federal lands," the 1988 Senate Report, like the 1982 House Report, fails to define "federal lands."

**[3]** In sum, the text examined in the two reports does not signal Congress' "clear intent" to limit "areas under Federal jurisdiction" to land owned by the federal government, as Defendants suggest, or to extend it to "waters of the United States" as defined by the CWA, as River Watch contends. Indeed, even if we concluded that based on the two reports "federal lands" has a specific meaning, the fact that Congress made a conscious choice to use "areas under Federal jurisdiction" in the ESA, rather than "federal lands," further confuses the issue. Therefore, we conclude that the meaning of the statutory text "areas under Federal jurisdiction" is not plainly clear from the text of the ESA, nor does the ESA's legislative history elucidate Congress' intent in using the term. We agree with the district court's conclusion that "Congress did not explain what it meant by 'areas under Federal jurisdiction,' " and we proceed to examine whether the FWS's interpretations offered in the United States' amicus brief satisfy the requirements set forth in *Mead. See Wilcox*, 547 F. Supp. 2d at 1076.

## B. *Mead* Requirements

**[4]** Under *Chevron*, "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *Brand X*, 545 U.S. at 980. *Chevron* deference, however, applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference

was promulgated in the exercise of that authority." *Mead Corp.*, 533 U.S. at 226-27.

**[5]** Here, the FWS is the agency responsible for the protection and recovery of endangered plant species. 50 C.F.R. § 402.01(b). The FWS, therefore, has the authority to interpret the ESA in rules carrying the force of law. *See, e.g.*, *Sweet Home*, 515 U.S. at 691 n.2. The Supreme Court has explained that "[t]he latitude the ESA gives the Secretary [of the Interior] in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary's [and by extension the FWS's] reasonable interpretation." See *id.* at 703; *see also* 16 U.S.C. § 1540(f).

**[6]** Moreover, just as the Corps' expertise gives it the authority to make certain determinations about the extent of its jurisdiction under the CWA, the FWS's expertise on endangered species provides it with an adequate basis to determine whether, under the ESA, certain privately-owned lands might also be considered "areas under Federal jurisdiction." *Cf. Rapanos*, 547 U.S. at 766 (noting that the Court permitted the Corps to find that it had jurisdiction under the CWA to regulate some privately-owned land on the basis of their "ecological judgment about the relationship between waters and their adjacent wetlands") (quoting *Riverside Bayview Homes, Inc.*, 474 U.S. at 134); *Sweet Home*, 515 U.S. at 698 (concluding that "the broad purpose of the ESA supports the Secretary's decision to extend protection against activities that cause the precise harms Congress enacted the statute to avoid"). Therefore, the first requirement under *Mead* for granting *Chevron* deference is met.

The United States asks us to defer to several purportedly relevant statements found in three rules that add plants to the endangered species list.[11] We have previously determined that

---

[11]The United States also asks us to grant *Chevron* deference to the *Habitat Conservation Planning And Incidental Take Permit Processing Hand-*

such rulings were promulgated by the FWS in the exercise of its delegated authority. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 954 (9th Cir. 2009). Thus the second requirement under *Mead* for granting *Chevron* deference, that "the agency interpretation claiming deference was promulgated in the exercise of that authority," is also met. *Mead Corp.*, 533 U.S. at 227. Therefore, we proceed to the second step of *Chevron*.

## C. *Chevron* Step Two

At step two of the *Chevron* analysis, we normally review an agency's interpretation of a statute to determine if it is a reasonable construction of the law at issue. *Brand X*, 545 U.S. at 986. The United States concedes that the FWS has not explicitly defined "areas under Federal jurisdiction" through regulation. Instead, the United States argues that three FWS rules and a guidance manual ("the Handbook") provide an interpretation of "areas under Federal jurisdiction" which is due *Chevron* deference. We are not persuaded.

### 1. *The Three Rules*

The United States cites three rules, which were promulgated by the FWS using formal rule-making authority, as evidence of the FWS's interpretation of the phrase "areas under Federal jurisdiction." The three rules designate certain plant species as endangered or threatened. None of these rules, however, interprets "areas under Federal jurisdiction;" instead, the rules use the phrase in passing and somewhat interchangeably with the term "federal lands." Thus, the three rules do not provide an agency interpretation to which we could defer under *Chevron*.

---

*book*, which is a guidance manual. For the reasons described later in this opinion, we determine that the Handbook is not entitled to *Chevron* deference. *See infra* Part II.C.2.

For example, in the first rule, Endangered or Threatened Status for Seven Central Florida Plants, the FWS writes only, "for endangered plants, the 1988 amendments (Pub. L. 100-478) to the Act prohibit the malicious damage or destruction on Federal lands . . . ." 58 Fed. Reg. 25,746, 25,754 (Apr. 27, 1993). This language offers no assistance, because it is not clear from the rule's text how "areas under Federal jurisdiction" relates to "Federal lands." Moreover, as with the congressional reports, the rule offers no definition of "Federal lands." The question we must answer is whether "areas under Federal jurisdiction" includes "waters of the United States" as defined by the CWA and the Corps. This rule, like the legislative history of the ESA, simply does not address this issue.

In the second rule, Determination of Endangered Status for Three Plants, Blennosperma Bakeri (Sonoma Sunshine or Baker's Stickyseed), Lasthenia Burkei (Burke's Goldfields), and Limnanthes Vinculans (Sebastopol Meadowfoam), the United States relies on language discussing how to protect Sebastopol meadowfoam, which is primarily found on privately-owned land. 56 Fed. Reg. 61173, 61,180-81 (Dec. 2, 1991). The United States finds it significant that the rule states that the "[p]rotection of these species' habitats will be addressed through the recovery process and through the [ESA's] section 7 consultation process," but that the rule fails to mention that habitats on privately-owned land also can be protected under § 9(a)(2)(B). *Id.* at 61181. River Watch does not contest that the § 7 consultation process is one way the ESA protects Sebastopol meadowfoam growing on private land.[12] The question is whether that is the *only* way the ESA

---

[12]As described earlier, under § 7, an agency must confer with the FWS prior to authorizing any action, in order to make sure that the action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). Such authorization requiring a § 7 conference with the FWS takes place when the Corps grants a permit to discharge prohibited material like dredged soil, rock, sand, and cellar dirt into a navigable water, like an adjacent wetland. *See id.*

protects endangered plants growing on privately-owned land. Again, the rule simply does not indicate that the FWS gave any thought to this issue. Because this issue is, if anything, only addressed tangentially (and possible only through the United States' post-hoc litigation arguments), we conclude that it is inappropriate to grant *Chevron* deference to this rule.

In the third rule cited by the United States, Determination of Endangered or Threatened Status for Five Desert Milk-vetch Taxa from California, 63 Fed. Reg. 53,596 (Oct. 6, 1998), the FWS explains that "[l]isted plants have limited protection under the Act, particularly on private lands. . . . Generally, on private lands, collection of, or vandalism to, listed plants must occur in violation of State law to be a violation of section 9." 63 Fed. Reg. at 53,610-11. The text in the rule indicates only that a violation of state law is "[g]enerally" the way in which § 9's protections for endangered plants growing on private land are invoked. The text of the rule, however, does not act as limiting language and thus does not help us in this case.

### 2.  *The Handbook*

The United States also urges us to give *Chevron* deference to an "interpretation" of "areas under Federal jurisdiction" found in the *Habitat Conservation Planning And Incidental Take Permit Processing Handbook*, an FWS guidance manual for conducting the incidental take permit program under ESA § 10. *Habitat Conservation Planning And Incidental Take Permit Processing Handbook* (1996), *available at http:// www.nmfs.noaa.gov/pr/pdfs/laws/hcp_handbook.pdf* [hereinafter *HCP Handbook*]. The Handbook states that "the ESA does not prohibit the incidental take of federally listed plants on private lands *unless* the take or the action resulting in the take is a violation of state law (which in most cases eliminates the need for an incidental take permit for plants)." *Id.* at 3-17.

Although issued after public notice and comment, *see* 61 Fed. Reg. 63,854 (Dec. 2, 1996); 59 Fed. Reg. 65,782 (Dec. 21, 1994), the Handbook is not deserving of *Chevron* deference. First, "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant *Chevron*-style deference."[13] *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Second, the Handbook explicitly states that "nothing in this handbook is intended to supersede or alter any aspect of Federal law or regulation pertaining to the conservation of endangered species." *HCP Handbook* at 1-3. Indeed, the Handbook is meant only to provide "guidance on" the ESA § 10 permit process. *See id.* at 1-1 ("The purpose of this handbook is to guide the [FWS] and National Marine Fisheries Services . . . in processing incidental take permit applications and participating in associated habitat conservation."), 1-3 ("[T]his handbook establishes detailed but flexible guidelines to be

---

[13]This case is distinguishable from *Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Service*, 475 F.3d 1136 (9th Cir. 2007), where we extended *Chevron* deference to the FWS's policy guidelines on criteria for consideration of petitions to list endangered species. *Id.* at 1150. In *Northwest Ecosystem Alliance*, we emphasized that 16 U.S.C. § 1533(h) required the FWS to publish the proposed guidelines in the Federal Register and to provide an opportunity for written comment, in a process similar to the notice-and-comment rule making under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq. Nw. Ecosystem Alliance,* 475 F.3d at 1142. Further, there was no evidence that the agency ever treated the guidelines as anything other than legally binding. *Id.* at 1143.

The situation here is markedly different. Although the FWS published the Handbook and sought comments, it did not do so pursuant to § 1533(h) or as notice-and-comment rule making under the APA. Moreover, the purpose of the Handbook was to provide "detailed but flexible guidelines" on granting incidental take permits and not to define "areas under Federal jurisdiction." *HCP Handbook* at 1-3. And, as noted *infra* in footnote 14, the FWS previously argued that the Handbook was not binding. *Nw. Ecosystem Alliance,* 475 F.3d at 1142 n.5 (quoting *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1292 (E.D. Cal. 2000)). In light of the conclusory use of the term in several sections of the Handbook, there appears to have been little thought given to the meaning of the term.

used in developing HCPs [habitat conservation planning], processing section 10(a)(1)(B) permit applications, and managing ongoing HCP programs."); *see also* 61 Fed. Reg. 19,308, 19,310 (May 1, 1996). Third, although the Handbook has been cited in at least four circuit opinions, none has treated it as meriting *Chevron* deference. *See, e.g.*, *Nw. Ecosystem Alliance*, 475 F.3d at 1142-43; *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 227 (D.C. Cir. 2005); *Morris v. United States*, 392 F.3d 1372, 1377 (Fed. Cir. 2004); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1243, 1243 n.11 (11th Cir. 1998).[14] Finally, the 300+ page Handbook does not discuss "areas under Federal jurisdiction" other than in one paragraph where it restates the statute. In sum, the focus of the Handbook is the § 10 incidental take permit program, and any interpretation one might glean from the Handbook is attenuated at best.

**[7]** Therefore, although the FWS has the authority to fill in the statutory "gaps" of the ESA through the promulgation of rules and regulations, we hold that contrary to the United States' arguments, the FWS has not yet interpreted "areas under Federal jurisdiction."

### D.    Alternatives to *Chevron* deference

Although an agency may not have formally interpreted a statute, the agency's construction may still "merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency." *Mead Corp.*, 533 U.S. at 234 (quoting *Skidmore v. Swift*

---

[14]The Eleventh Circuit recognized that the Handbook was only an "informal publication" which was not binding on the court. *Loggerhead Turtle*, 148 F.3d at 1243, 1243 n.11. And, in at least one district court case, the Secretary of the Department of the Interior previously argued that the Handbook was not legally binding. *Nat'l Wildlife Fed'n*, 128 F. Supp. 2d at 1292; *see also WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 622 F. Supp. 2d 1155, 1164 (D. Utah 2009) (holding that the Handbook was an informal guidance material that was not binding).

*& Co.*, 323 U.S. 134, 139 (1944)). We give such an agency interpretation "respect proportional to its 'power to persuade.' " *Id.* at 235 (quoting *Skidmore*, 323 U.S. at 140). Here, we conclude, however, that for the reasons set forth above, the FWS's three rules and the Handbook address the issue before us only tangentially. The rules and the Handbook, therefore, have no "power to persuade" us of any particular interpretation of "areas under Federal jurisdiction."

The United States also urges us to defer to the interpretation of the ESA set forth in its amicus brief, pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997). This argument is without merit. In *Auer*, the Supreme Court gave weight to an agency interpretation advanced in an amicus brief of an ambiguous *regulation* promulgated by the same agency. *Id.*; *see also Gonzales v. Oregon*, 546 U.S. 243, 256 (2006); *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555 n.9 (9th Cir. 2009) (reviewing cases in which the Ninth Circuit has granted *Auer* deference). In this case, the amicus brief purports to interpret statutory, not regulatory, language. Moreover, in *Gonzales*, the Supreme Court refused to extend *Auer* deference to regulations that simply parroted a statute, holding that "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzales*, 546 U.S. at 257. Here, the three rules cited by the United States essentially parrot the statutory language. Because they "give[ ] little or no instruction on a central issue in this case," the FWS's three rules and the Handbook cannot support the FWS's efforts to decide the meaning of "areas under Federal jurisdiction" in the amicus brief. *See id.*

### E.   Judicial Construction

**[8]** Without any agency interpretation of "areas under Federal jurisdiction" to which we must defer, we proceed to interpret the term. We agree with the district court that River

Watch's proposed construction of § 9(a)(2)(B) is not tenable. The potential for overbreadth posed by interpreting "areas under Federal jurisdiction" as including all "waters of the United States" is simply too large. The CWA, which defines "waters of the United States," provides for far-reaching regulatory authority based on "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems." *Riverside Bayview Homes, Inc.*, 474 U.S. at 133. Therefore, under River Watch's proposed construction, without any discussion or explanation, the FWS would immediately gain coextensive regulatory authority with the Corps.

The broad sweep of the Corps' authority to regulate was sharply debated in *Rapanos*, in which the Court split 4-1-4 with regard to the limits of the Corps' regulatory jurisdiction of non-adjacent wetlands on privately-owned land. The plurality opinion characterized the Corps' ability to regulate as overly expansive, noting that "the Corps consciously sought to extend its authority to the farthest reaches of the commerce power." *Rapanos*, 547 U.S. at 738 (citing 42 Fed. Reg. 37,122, 37,127 (1977)). Even Justice Kennedy's concurrence is based on his concern about "the potential over-breadth of the Corps' regulations." *Id.* at 782 (holding that the Corps has jurisdiction on the basis of adjacency to regulate wetlands adjacent to navigable-in-fact waters, but "must establish a significant nexus on a case-by-case basis" if the wetlands are adjacent to nonnavigable tributaries). *In City of Healdsburg*, 496 F.3d at 999-1000, the court found that Justice Kennedy's concurrence in *Rapanos* "provides the controlling rule of law for our ase." We did not, however, foreclose the argument that Clean Water Act jurisdiction may also be established under the plurality's standard.

Moreover, River Watch's reading could arguably be expanded to apply to private lands which are subject to any sort of federal regulatory jurisdiction by any federal statute, i.e. everywhere. Such an interpretation would make the third prong of § 9(a)(2)(B) mere surplusage. Although the first two

prongs of § 9(a)(2)(B) apply to "areas under Federal jurisdiction," the third prong applies to "any other area." The third prong's prohibitions apply only when the person acts "in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law." 16 U.S.C. § 1538(a)(2)(B). This prohibition makes sense only if non-criminal trespassers who damage or destroy a listed plant on private lands are generally not liable under the ESA.

**[9]** River Watch argues that this concern is far-fetched and that we may narrowly hold that "waters of the United States" are "areas under Federal jurisdiction." We are not convinced that it would be prudent to create such a piecemeal expansion of the term "areas under Federal jurisdiction," especially when the FWS has not yet squarely addressed the issue. While we recognize that "areas under Federal jurisdiction" or "federal lands" surely includes areas under the control of the federal government, i.e. through ownership, leasehold-estates, or conservation easements, we do not interpret "areas under Federal jurisdiction" to encompass wetlands that are adjacent to navigable waters and therefore subject to only the regulatory jurisdiction of the Corps.

**[10]** In sum, we hold that River Watch has not established that the plain language of the ESA mandates that "waters of the United States" are "areas under Federal jurisdiction." We agree with the United States that the term is ambiguous, but we conclude that, thus far, the FWS has not promulgated regulations or offered any guidance materials specifically addressing this issue to which we must defer. We thus interpret "areas under Federal jurisdiction" as not including all of the "waters of the United States" as defined by the CWA and its regulations. Although our ruling will constitute "binding law," we recognize that under *Brand X*, we are not the "authoritative interpreter" of "areas under Federal jurisdiction." *See* 545 U.S. at 983. The FWS might have good reason to issue regulations or guidance that more thoroughly addresses this issue at some later date, and our decision does not fore-

close the possibility that the FWS might adopt some version of the statutory construction set forth by River Watch. *See id.* After all, the objective of the ESA, to provide a program and means to conserve endangered species and their ecosystems, 16 U.S.C. § 1531(b), is surely intertwined with that of the CWA, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

## III.   Conclusion

**[11]** For the reasons set forth above, we conclude that the district court did not err in rejecting River Watch's proposed interpretation of "areas under Federal jurisdiction" in § 9 of the ESA, and therefore affirm the grant of summary judgment to Defendants.

AFFIRMED.