**WILDEARTH GUARDIANS, Plaintiff,**

v.

**Sally JEWEL, in her capacity as United States Secretary of the Interior, and United States Fish and Wildlife Service, Defendants,**

**and**

**Board of County Commissioners of Gunnison County, Colorado, American Petroleum Institute, and Western Energy Alliance, Intervenor–Defendants.**

2:14–cv–00833 JWS

United States District Court, D. Arizona.

Signed September 08, 2015

Ashley D. Wilmes, Louisville, CO, Daniel John Rohlf, Thomas C. Buchele, Lewis & Clark Law School, Portland, OR, Sarah K. McMillan, Wildearth Guardians, Missoula, MT, for Plaintiff.

Mary Elisabeth Hollingsworth, US Dept of Justice, Washington, DC, for Defendant.

**ORDER AND OPINION**

JOHN W. SEDWICK, SENIOR
UNITED STATES DISTRICT JUDGE

### I. MOTIONS PRESENTED

At docket 75, plaintiff WildEarth Guardians ("Plaintiff") filed a motion for summary judgment as to its challenge to the United States Fish and Wildlife Service's November 14, 2013 decision denying Plaintiff's petition to list the Gunnison's prairie dog as an endangered or threatened species pursuant to the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"). At docket 81 defendants Sally Jewell and the United States Fish and Wildlife Service ("Federal Defendants") filed their response and a cross motion for summary judgment. Intervenor Defendants filed

response briefs in support of Federal Defendants' position at dockets 83 and 84. Plaintiff's response to the cross-motion for summary judgment and its reply in support of its motion is at docket 85. Federal Defendants' reply is at docket 100. Oral argument was heard August 28, 2015.

## II. STATUTORY FRAMEWORK

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species."[1] Under the ESA, an endangered species is one that is "in danger of extinction throughout all or a significant portion of its range."[2] A threatened species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[3] The decision about whether to list a species under the ESA must be based upon the consideration of five factors:

> (A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting [the species'] continued existence.[4]

Listing of a species may be done in response to a petition.[5] If a petition is filed, the United States Fish and Wildlife Service (the "Service") must determine "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."[6] The Service's initial finding in response to a petition is called a "90–day finding." If the Service determines that action may be warranted then it initiates a full-status review of the species. It must gather the best data available and analyze that data in relation to the five factors described above to determine whether listing of the species is warranted.[7] This final decision is called a "12–month finding." The Service is required to make such a finding "solely on the basis of the best scientific and commercial data available to [it] after conducting a review of the status of the species and after taking into account" existing efforts to protect the species.[8]

## III. BACKGROUND

In 2004 Plaintiff and other individuals and organizations submitted a petition to the Service requesting that it list the Gunnison's prairie dog ("GPD") as a threatened or endangered species pursuant to the ESA. GPDs are one of five species of prairie dogs found in North America. GPDs inhabit grasslands and shrub-steppe landscapes of intermountain valleys in the "Four Corners" region of northern Arizona, southwestern Colorado, northwestern New Mexico, and southeastern Utah. They are considered a "keystone" species given the important role they play in their habitat. The 2004 petition asserted that the GPD should be listed under the ESA because of "significant population declines, ongoing habitat loss and degradation, overutilization due to shooting, unrestricted poisoning, threats attributed to disease, inadequate regulatory mechanisms, and

---

1. 16 U.S.C. § 1531(b).

2. *Id.* at § 1532(6).

3. *Id.* at § 1532(20).

4. *Id.* at § 1533(a)(1).

5. *Id.* at § 1533(b)(3)(A).

6. *Id.*

7. *Id.* at § 1533(b)(3)(B).

8. *Id.* at § 1533(b)(1)(A).

other factors, including drought." [9] In early 2006 the Service published a 90–day finding, which concluded that Plaintiff's petition did not present substantial scientific information to indicate that listing the GPD may be warranted under the ESA.[10]

After Plaintiff filed a complaint challenging the finding, the Service agreed to conduct and publish a 12–month finding. In February of 2008, the Service issued its finding ("2008 Finding") wherein it determined that listing the GPD was only warranted in the "montane portion" of the species' range in certain parts of Colorado and New Mexico [11] and not warranted within the remaining "prairie portion" of its range.[12] However, the Service concluded that even though listing was warranted, it was nonetheless precluded by other listing priorities. Plaintiff again challenged the finding, and the court granted its motion for summary judgment, holding that the Service impermissibly determined that only a portion of the species was entitled to listing; that is, there was no support for the fact that GPDs living in the montane regions of its range were a separate species.[13] As part of a stipulated settlement agreement with Plaintiff and other parties, the Service agreed to submit a new 12–month finding on the petition to list the GPD.

On November 14, 2013, the Service published its new finding ("2013 Finding").[14] The Service determined that the best available science showed that the GPD can be differentiated into two subspecies: *Cynomys gunnisoni gunnisoni* and *C.g. zuniensis*. The ranges of these two sub-species correspond roughly to the "montane" and "prairie" ranges described in the Service's 2008 Finding; the *Cynomys gunnisoni gunnisoni* subspecies is generally found in the montane portions of the range and the *C.g. zuniensis* is generally found in the prairie portions of the range. However, unlike the 2008 Finding, the Service concluded that, based on scientific information available to it, neither subspecies warrant listing under the ESA. It concluded that both populations are stable and that no threats are placing or expected to place either subspecies in danger of extinction.

Plaintiff now challenges the Service's decision in its 2013 Finding to deny the petition to list the GPD as an endangered or threatened species pursuant to the ESA. Plaintiff contends that the "Service arbitrarily and unlawfully concluded [in its 2013 Finding] that both subspecies of Gunnison's prairie dog (*C.g. gunnisoni and C.g. zuniensis*) are not endangered or threatened throughout all or a significant portion of their range." [15] In its motion for summary judgment, Plaintiff alleges that the Service acted arbitrarily by (1) failing to properly interpret and apply the language "throughout all or a significant portion of its range" in the ESA, as well as failing to interpret the term "significant" in a manner that provides it meaning under the ESA; (2) inconsistently using various definitions of range when applying the ESA's five-factor threats analysis; (3) failing to explain its conclusions pertaining to invasive plant species; (4) reversing its prior conclusion that plague threatens the montane portion of the GPD range; and

**9.** Doc. 1 at p. 11.

**10.** 71 Fed.Reg. 6,241 (Feb. 7, 2006).

**11.** The montane portion is a wetter climate at a higher elevation compared to the prairie portion of its range. *See* doc. 75–2 at ¶ 5.

**12.** 73 Fed.Reg. 6,660 (Feb. 5, 2008).

**13.** *WildEarth Guardians v. Salazar,* No. 09–CV–00574–PHX–FJM, 2010 WL 3895682 (D.Ariz. Sept. 30, 2010).

**14.** 78 Fed.Reg. 68,660 (Nov. 14, 2013) (at Doc. 75–3).

**15.** Doc. 1 at 2 pp. 1–5.

(5) ignoring available information about grazing. Federal Defendants argue that its decision not to list either subspecies of the GPD was reasonable in all respects. It sets forth an argument as to why its interpretation of the ambiguous language in the ESA involving the species' range is correct and otherwise due deference. Relatedly, it argues that its method for determining whether a portion of a species' range is actually significant is irrelevant to the 2013 GPD Finding. It also argues that it properly applied the best available information when conducting its threats analysis and that there is no information in the record showing detrimental range-wide impacts on the GPD population. It asserts that any difference between the 2008 Finding and the 2013 Finding is rationally based on new information and a different understanding of the prior facts.

## IV. STANDARD OF REVIEW

■■■ "Agency decisions under ESA are governed by the Administrative Procedure Act, which requires an agency action to be upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" [16] Review under the arbitrary and capricious standard is narrow, and the court will not substitute its judgment for that of the

agency.[17] The court must be particularly deferential when the agency is analyzing scientific or technical data within its expertise.[18] A decision is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." [19]

■■■ The court's review of final agency action under the APA does not require fact finding because its review is limited to the administrative record. Thus, because such a case does not involve disputed facts, summary judgment is the proper mechanism for resolving it.[20] The court's role in resolving a summary judgment motion is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." [21]

## V. DISCUSSION

### A. Interpretation of "throughout all or a significant portion of its range"

As explained above, a species is listed for protection under the ESA if it is in

---

**16.** *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir.2001) (quoting 5 U.S.C. § 706(2)(A)).

**17.** *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir.2008) (en banc), *rev'd on other grounds by Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

**18.** *See Ariz. Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160, 1163 (9th Cir.2010) ("In recognition of the agency's technical expertise the court usually defers to the agency's analysis, particularly within its area of competence."); *Trout Unlimited v. Lohn,* 559 F.3d 946, 959 (9th Cir.2009) ("It is not our role to

ask whether we would have given more or less weight to different evidence, were we the agency. Assessing a species' likelihood of extinction involves a great deal of predictive judgment ... [which is] entitled to particularly deferential review.").

**19.** *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

**20.** *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471–72 (9th Cir.1994).

**21.** *Occidental Eng'g Co. v. Immigration & Naturalization Serv.,* 753 F.2d 766, 769 (9th Cir.1985).

danger of extinction, or likely to become endangered in the foreseeable future, "throughout all or a significant portion of its range." [22] In its 2013 Finding, the Service indicated that it interpreted the ESA's language to mean that a species can be listed for protection everywhere the species is located if it is endangered or threatened throughout all of its range *or* in a significant portion of its range. That is, it understood the phrase " 'significant portion of its range' [to provide] an independent basis for listing and protecting the entire species." [23] Consequently, when the Service considers whether to list a species under the ESA, it analyzes the status of a species range-wide, and then, if stable and not at risk from the listed threats range-wide, it determines whether there are any specific portions of the range that need further analysis.

In line with its interpretation of the statute, the Service first analyzed the status of the GPD range-wide. In doing so, the Service looked at the GPD's "distribution, abundance, and trends." [24] It noted that "[e]stimating the abundance of prairie dogs, or the number of individuals in a population, is notoriously difficult" and that, therefore, abundance estimates historically have been expressed as acres of occupied habitat. [25] While aerial mapping of the GPD's colonies is more efficient than actual counting, it is nonetheless "time-consuming" and "logistically unfeasible." [26]

Mapping also has the potential to overestimate the area of occupied habitat and is generally inaccurate. [27] Occupancy modeling is a newer technique for estimating GPD that has been used since 2005. "Occupancy models detect changes over time in the proportion of habitats occupied by a species, which correlates to changes in population size." [28] It provides insight into the GPD's metapopulation structure, which is important to the species' viability. [29] It is a statistically based model that provides an estimated percentage of occupancy within the species' predicted range. [30] The GPD's predicted range is area where the species could potentially be located based on habitat characteristics such as the surrounding vegetation and slope. [31] Although the Service recognizes that not all areas within the predicted range are occupied by the GPD or necessarily suitable for the GPD, it is nonetheless an approximated area where GPDs are most likely to be found within the outer boundaries of the GPD's range. The occupancy models do not provide information about colony size or the exact location of the colonies and do not provide the number of occupied acres. Thus, reliable comparisons to past approximations of the GPD's occupied acres—that is data obtained prior to 2005—is not possible. [32] While occupancy modeling does not provide a spacial representation of where exactly the GPD can be found, the Service concluded that the technique "is well-established in the literature and

---

**22.** 16 U.S.C. § 1532(6), (20).

**23.** 78 Fed.Reg. at 68,683–84 (Doc. 75–3 at p. 26).

**24.** *Id.* at 68,665 (Doc. 75–3 at p. 7).

**25.** 78 Fed.Reg. at 68,667 (Doc. 75–3 at p. 9).

**26.** *Id.*

**27.** *Id.*

**28.** *Id.*

**29.** *Id.* at 68,667, 68,662 (Doc. 75–3 at pp. 4, 9).

**30.** *Id.* at 68,667 (Doc. 75–3 at p. 9).

**31.** *Id.* at 68,665 (Doc. 75–3 at p. 7). The Finding notes that the "predicted range provides a more accurate, spacial range for the GPD, but it similarly does not imply that all the areas within that range are occupied or suitable." *Id.*

**32.** 78 Fed.Reg. at 68,667 (Doc. 75–3 at p. 9).

deemed adequate and reliable for the long-term monitoring of the [GPD]." [33] It provides the "best available information regarding the [GPD's] current population status and trends." [34]

The 2013 Finding indicates that the predicted range is about 23.5 million acres and that, based on the most recent occupancy surveys and subsequent modeling, the GPD currently occupies about 20 percent of that theoretically available habitat.[35] The 2013 Finding describes how the GPD's estimated occupied areas has changed over time; in 1916 the GPD occupied about 24.3 million acres but by 1961 that number had dropped about 95 percent to 1 million acres "largely because of disease and poisoning." [36] It then summarized known, piecemeal data related to the GPD's abundance and occupancy trends after 1961 and indicated that the populations fluctuated after that time with some increases in Arizona and Colorado.[37] The 2013 Finding then goes on to discuss the occupancy surveys undertaken in 2005, 2007, and 2010 across the four states in which the GPD is located and concludes that the occupancy percentages have been stable since 2005.[38] It concludes that there is "sufficient redundancy of populations for continued stability." [39] The Service then examined whether any of the five listed factors, individually or collectively, threaten that stability.

After determining that there were no range-wide threats to the GPD's stability, it then proceeded to examine whether there were any significant portions of the GPD's range where the species could be in danger of extinction. Recognizing that "[t]he range of a species can theoretically be divided into portions in an infinite number of ways," the Service determined that the only portions warranting further consideration are those portions that are biologically significant, as defined further in the finding, and wherein the species may be particularly "in danger of extinction or likely to become so within the foreseeable future." [40] That is, the portion must be both significant and have threats present that put the species at risk before further consideration is necessary.[41] The Service explained that "[i]n practice, a key part of the determination that a species is in danger of extinction in a significant portion of its range is whether the threats are geographically concentrated in some way." [42] If there is a concentration of threats in a specific portion, then the Service would determine whether that "portion qualifies as 'significant' by asking whether without that portion, the representation, redundancy, or resiliency of the species would be so impaired that the species would have an increased vulnerability to threats to the point that the overall species would be in danger of extinction." [43] Applying this definition and methodology to the GPD, the Service never looked at whether any portion met the definition of significant, because it determined that there was no concentration of threats anywhere within the predicted or overall range.

Plaintiff challenges the Service's 2013 Finding denying protection to the GPD

33. *Id.*

34. *Id.* at 68,667–68 (Doc. 75–3 at pp. 9–10).

35. *Id.* at 68,670 (Doc. 75–3 at p. 12).

36. *Id.* at 68,668 (Doc. 75–3 at p. 10).

37. 78 Fed.Reg. at 68,668–70 (Doc. 75–3 at pp. 10–12).

38. *Id.* at 68,669–70 (Doc. 75–3 at pp. 11–12).

39. *Id.* at 68,670 (Doc. 75–3 at p. 12).

40. *Id.* at 68,684–85 (Doc. 75–3 at pp. 26–27).

41. *Id.* at 68,685 (Doc. 75–3 at p. 27).

42. *Id.*

43. *Id.* at 68,684 (Doc. 75–3 at p. 26).

based on the Service's failure to consider the species' lost historic occupied areas as potentially significant portions of the GPD's range as required by *Defenders of Wildlife v. Norton*.[44] In that case, the Ninth Circuit reversed the Service's decision not to designate the flat-tailed horned lizard for protection under the ESA, because the Secretary had failed to consider whether the lizard's lost historic range amounted to a "significant portion of its range." The court there noted that the Service had not "expressly considered" the "significant portion of its range" issue at all, and the Service's arguments as for how the issue should be decided were not supported by other regulations or rulings. Thus, it indicated that it owed no deference to the Service's interpretation and instead concluded that under the ESA "a species can be extinct 'throughout ... a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was."[45]

The Ninth Circuit revisited the issue in *Tucson Herpetological Society v. Salazer*[46] and affirmed that Defenders requires the service to analyze lost historic range under the ESA. It noted that "Defenders left the appropriate criteria for testing 'significance' undefined, but made clear that the [Service] must develop some rational explanation for why the lost and threatened portions of a species' range are insignificant before deciding not to designate the species for protection."[47]

Plaintiff points out that the 2013 Finding failed to explain why the lost historical range of the GPD is not a significant portion of its range. The Service asserts that it did not need to follow *Defenders* given that it has since developed an official interpretation of the ESA's phrase "throughout all or a significant portion of its range," which has gone through the notice and comment procedure and is thus entitled to *Chevron* deference and reviewed only for reasonableness. The Service's "Final Policy on Interpretation of the Phrase 'Significant Portion of its Range'" was published on July 1, 2014 (2014 Policy).[48] The policy sets forth the process by which the Service will determine whether a species is in danger of extinction, or threatened to be in danger of extinction, "throughout all or a significant portion of its range." Specifically, it explains that the Service first looks at the status of the species in its current range and determines whether there are factors that threaten the species range-wide. Then, after that analysis, it will determine whether there are any specific portions that need further analysis by looking for concentration of threats. That is what the Service did in the 2013 Finding. The 2014 Policy also explains that historical losses are taken into account, but only as a consideration of the species' stability range-wide. It takes into account "the effects that loss of historical range may have on the current and future viability of the species," but does not specifically consider whether that lost range constitutes a "significant portion of its range."[49] It goes on to define what it means for a portion of range to be "significant"—applying the same interpretation as set forth in the 2013 Finding. Federal Defendants note that the 2014 Policy is due *Chevron* deference, and thus, the specific requirement that lost historical range be considered as a potentially significant portion as set forth in *Defenders* is not applicable anymore. Alternatively, they argue that *Defenders* is not applicable to the situation

---

**44.** 258 F.3d 1136 (9th Cir.2001).

**45.** *Id.* at 1145, 1145 n. 11.

**46.** 566 F.3d 870 (9th Cir.2009).

**47.** *Id.* at 877.

**48.** 79 Fed.Reg. 37,578 (July 1, 2014).

**49.** 79 Fed.Reg. at 37,583.

here, because, unlike the lizard's range in *Defenders,* there are not major geographical areas where the GPD is no longer viable; that is, contraction of available habitat is not the primary issue here.

■ In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*[50] the Supreme Court held that a court must accept an agency's reasonable construction of an ambiguous statute even if the agency's reading differs from what a court believes is the best statutory interpretation. Such deference applies, however, "only when (1) it appears that Congress delegated authority to the agency generally to make rules carrying the force of law *and* (2) the agency interpretation claiming deference was promulgated in the exercise of that authority."[51] Thus, in determining whether to apply *Chevron* deference to the Service's interpretation of what it means to be endangered or threatened "throughout all or a significant portion of its range," this court must consider whether the statutory term is ambiguous, and, if it is, it must consider whether "Congress clearly delegated authority to the agency to make rules carrying the force of law, and . . . whether the agency interpretation was promulgated in the exercise of that authority."[52] If these requirements are met, the court then looks at whether the agency's interpretation is reasonable.

Here, the Ninth Circuit has already concluded that the term "significant portion of its range" in the ESA is ambiguous. Indeed, the parties do not contend otherwise. Also, it is clear that the Service is the "agency responsible for the protection and recovery of endangered [ ] species,"[53] and therefore, "has the authority to interpret the ESA" through rules that carry the force of law.[54] Indeed, any published guidelines setting forth criteria for making findings with respect to ESA listing decisions are rules that are promulgated pursuant to the Service's delegated authority and due *Chevron* deference.[55] Thus, the Service's 2014 Policy, which was subject to notice and comment and officially sets forth the Service's interpretation of what it means for a species to be in danger of extinction "throughout all or a significant portion of its range," is entitled to *Chevron* deference and is reviewed only for reasonableness.

■ The Plaintiff emphasizes that what is under review here is not the 2014 Policy but, rather, the 2013 Finding regarding the GPD. The Service's policy on the phrase "throughout all or a significant portion of its range" was only in draft form at the time of the 2013 Finding. However, despite the Service's recognition that it was not necessarily bound by the draft policy, the 2013 Finding nonetheless applied the same process and definitions discussed in more detail in the 2014 Policy. As noted by the Federal Defendants, "[c]ourts extend *Chevron* deference to an agency's authoritative interpretation of a statute even when the interpretation post dates the challenged administrative action" as long as it is not displacing any prior agency interpretation."[56] Here, the 2014 Policy was not replacing any prior official

**50.** 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**51.** *Price v. Stevedoring Servs. of Am., Inc.,* 697 F.3d 820, 826 (9th Cir.2012) (en banc) (internal quotations omitted).

**52.** *N. Cal. River Watch v. Wilcox,* 633 F.3d 766, 773 (9th Cir.2011).

**53.** *Id.* at 776.

**54.** *Id.*

**55.** *See Trout Unlimited,* 559 F.3d at 954; *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.,* 475 F.3d 1136 (9th Cir.2007).

**56.** Doc. 100 at p. 5. *See Smiley v. Citibank,* 517 U.S. 735, 744 n. 3, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (applying deference to the Comptroller of Currency's interpretation of

interpretation of the ESA phrase at issue. The court concludes that it should accord *Chevron* deference to the Service's authoritative interpretation of the ESA, even though it post dates the 2013 Finding.

 Even if the 2014 Policy is not considered and therefore cannot provide the basis for *Chevron* deference, "the fact that the [Service] previously reached its interpretation through means less formal than 'notice and comment' rulemaking ... does not automatically deprive the interpretation of the judicial deference otherwise its due." [57] The question is whether Congress meant for the Service's interpretation in a listing decision to have the force of law. Whether deference is due depends on the procedures that preceded the interpretation's adoption and other f actors, such as "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." [58] Given these considerations, the court concludes that the Service's interpretation and application of the ESA's "significant por-

tion of its range" phrase in the 2013 Finding is also entitled to *Chevron* deference, and thus, the court reviews it for reasonableness.

Federal Defendants assert that, because the Service has since established an interpretation on this issue, any deviation from the holding in *Defenders* is irrelevant because its interpretation trumps, citing *National Cable & Telecommunications Ass'n v. Brand X Internet Services.*[59] The Supreme Court in *Brand X* concluded that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and leaves no room for agency discretion." [60] However, courts applying *Defenders* have concluded that the ESA requires at least a consideration of lost historical range and its significance to a species' viability, and therefore, the court will consider whether the Service's 2013 Finding sufficiently did so.[61]

As stated in *Tucson, Defenders* requires the Service to at least analyze the significance of lost historical range.[62] The Service has discretion as how to best do that.[63]

---

the National Bank Act, even though it was set forth in a regulation that had been issued after the litigation began); *Barnhart v. Walton,* 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) ("[respondant] also asks us to disregard the Agency's interpretation of its formal regulations on the ground that the Agency only recently enacted those regulations, perhaps in response to this litigation. We have previously rejected similar arguments."); *Pauly v. U.S. Dep't of Agric.,* 348 F.3d 1143, 1152 (9th Cir.2003) (discussing *Smiley* ).

**57.** *Barnhart,* 535 U.S. at 221, 122 S.Ct. 1265.

**58.** *Id.* at 222, 122 S.Ct. 1265.

**59.** 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

**60.** *Id.* at 982, 125 S.Ct. 2688.

**61.** Indeed, the Service's official interpretation in the 2014 Policy was not that it could disregard historical range. Rather, it clarified that lost historical range is in fact relevant to the analysis, but that the Service will consider lost range in a different manner than contemplated by the Ninth Circuit in *Defenders.* It considers the effects of loss of historical range on the current status of the species, rather than explicitly considering whether lost historical range is itself a significant portion of a species' range. 79 Fed.Reg. at 37584.

**62.** 566 F.3d at 876.

**63.** *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1099 (9th Cir.2003) (noting that courts should be the most deferential when the agency is "making predictions, within its [area of] special expertise, at the frontiers of science.").

In the case of the GPD, there have not been major habitat contractions given that the GPD's historical range is similar to its current predicted range. Also, the best available science for estimating GPD abundance is occupancy modeling, which does not provide exact locations of prairie dog colonies, but rather, just shows that GPDs are located across 20 percent of the predicted range. While there may be specific locations within the predicted range where, despite there being available habitat, the ·GPD is no longer located, the current modeling program does not give the Service that data. In other words, the Service could not clearly delineate the GPD's lost range or where exactly the GPD is no longer viable despite the available habitat; thus, specific analysis of any lost range, as was required in *Defenders,* is not possible based on the best data available, but the Service nonetheless considered historical losses.

 As described above, the Service first analyzed whether the GPD is in danger of extinction ·throughout all of its range. The analysis included an examination of the GPD's historic occupied range and a discussion about why the reduction in the number of occupied acres does not render the species at risk. For example, the 2013 Finding recognized that there has been a decrease in occupied areas since early 1900s, that the majority of the decrease occurred prior to 1961, and that declines were mostly due to poisoning campaigns and disease. It noted that prai-

rie dog "eradication efforts have decreased in magnitude." It looked at the trends after 1961 and summarized the piecemeal occupancy acreage data available. It concluded that the abundance of GPDs post–1961 have fluctuated with some losses and some gains.[64] Based on the new occupancy modeling data from 2005, 2007, and 2010 in Colorado and from 2007 and 2010 in the other states, the Service did not find evidence of recent declines, but rather, found stability in occupancy and noted that the GPD's "percent occupancy represents the current status of the [GPD] across its range." Therefore, the Service clearly considered historical losses even though it could not identify portions of lost range. It concluded that despite past losses, which primarily occurred prior to 1961, the GPD was not in danger of extinction throughout its range. Applying the requisite deference that is due to the Service's determination about how to analyze the importance of historical losses, the court concludes that the Service's reliance on the GPD's current persistence to demonstrate that any lost range is not significant is reasonable.

 Also, the Service conducted a subsequent "significant portion of its range." analysis here that essentially included historic range. That is, it did not ignore a portion of the ESA's language by failing to look at portions of the GPD's range. As described above, when deciding how to identify portions of a species' range for further "significant portion of its range" analysis, the Service looks at whether there are any "concentration of threats." [65]

---

**64.** The 2013 Finding noted that the acreage of habitat occupied by the GPD has increased from the 1961 levels in Arizona and Colorado.

**65.** Neither Plaintiff's complaint nor its motion for summary judgment raised a challenge to the "concentration of threats" threshold test. Plaintiff, however, raised the issue in its reply brief. The argument is untimely. *Gadda v. State Bar of Cal.,* 511 F.3d 933, 937 n. 2 (9th Cir.2007) ("It is well established that issues

cannot be raised for the first time in a reply brief). Regardless, the 2013 Finding and the 2014 Policy explain why the Service looks for a concentration of threats. Moreover, the Service's inclusion of such an analysis is not new. *See W.· Watersheds Project v. Ashe,* 948 F.Supp.2d 1166, 1187 (D.Idaho 2013) (noting that the Service's historical approach for determining what might be a significant portion of range first considers whether there are any

Here, the Service could not have looked for a concentration of threats only in currently occupied areas because, as noted above, there is no map of such areas. Instead, the Service had to use the GPD's predicted range when it looked at whether there was a concentration of threats. Since the predicted range is almost the same as the historic range, when it determined there were no concentrated threats, it determined that there were no areas where further analysis would be required. That is, no areas in the predicted range, which is essentially the historic range, would meet the Service's test for "significant portion of its range analysis." Thus, even if the GPD is not currently occupying places where it once historically was, the Service concluded there was no concentration of threats in those areas which would contract available habitat.

Plaintiff also challenges the Service's definition of significant. The 2013 Finding defined a portion as significant if its contribution to the viability of the species is so important that without that portion, the species would be in danger of extinction.[66] Plaintiff asserts that this definition is similar to the one rejected by the Ninth Circuit in *Defenders,* and therefore, it fails to provide an independent meaning to the phrase "significant portion of its range." The 2013 Finding and the 2014 Policy explain why the Service believes there is a difference between the definition rejected by the court in *Defenders* and the one now used by the Service and why it believes the new definition gives the term independent meaning. The court need not decide whether that interpretation is reasonable because, as noted by the Federal Defendants, the Service's interpretation of "significant" is irrelevant to the 2013 Finding.

The Service concluded that there was no concentration of threats in any portion of the GPD's range and thus, in accordance with its methodology described above, the Service did not look at the significance question as it relates to the GPD, and therefore, any problems with the definition cannot provide grounds for challenging the 2013 Finding.

**B. Inconsistent delineation of the GPD's range during threats analysis**

 Plaintiff argues that the Service arbitrarily diluted its consideration of threats to the GPD by looking at threats to the GPD's overall range or predicted range rather than looking at threats that might affect the areas where the GPD can actually be found. The court finds this argument unpersuasive. Based on the 2013 Finding, there is no defined "current range" of the GPD. Rather, the current range is expressed as a percentage of the GPD's predicted range. As noted by Federal Defendants, "it is impossible to conduct the threats analysis considering only the 20 [percent] occupied by GPDs."[67]

Plaintiff also argues that the Service inconsistently and arbitrarily uses the term "range" when analyzing the impacts of agricultural land conversion, urbanization, and oil and gas development, sometimes using overall range and sometimes using predicted range. It argues that by using the improper scope of range at different points in the analysis it incorrectly calculated the amount of range that will be affected by agriculture and other habitat threats. Federal Defendants concede that the 2013 Finding cited the percent of over-

areas within the species' range where threats are concentrated).

**66.** 78 Fed.Reg. at 68,684–85 (Doc. 75–3 at pp. 26–27).

**67.** Doc. 100 at p. 13.

all range affected by agriculture (3 percent), rather than the percent of predicted range affected by agriculture (9 percent). However, it notes that the source cited by the Service in the 2013 Finding includes the calculations for predicted range.

■ Of importance here is whether the difference between the percentages should have altered the analysis. As noted by Federal Defendants, Plaintiff's arguments are limited to the issue of exposure (number of acres), but the ultimate question under the ESA is whether that exposure affects the species to an extent that is causing them to be in danger of extinction now or in the foreseeable future.[68] As described above, the Service first looked at the population of the GPD range-wide and how the five listing factors affect the GPD range-wide.[69] The 2013 Finding and record demonstrate that agricultural conversion has both negative and positive impacts on the GPD. When accompanied by control efforts, such as poisoning and shooting, agricultural land conversion can have a detrimental affect on GPD populations, but the 2013 Finding concludes that any "control efforts that may accompany agriculture currently occur locally and do not result in rangewide population declines."[70] The Finding also notes that the GPD may also benefit from agricultural land conversions because farmland provides highly productive forage for GPD.[71] The record also states that in all of the GPD states, except Colorado, farmland acreage has decreased.[72] Therefore, the Service concluded that there is no evidence that agricultural land conversion is a threat to the GPD's stability. Its conclusion is informed by the occupancy modeling data which

shows stability in the GPDs population. As noted by the Federal Defendants, Plaintiff does not point to evidence in the record to show that the GPD is being affected range-wide by agriculture land conversion. The same is true regarding the Service's analysis regarding urbanization and oil and gas development. That is, there is no evidence of widespread impacts from these threats. The court cannot say that the Service improperly failed to consider an important aspect of the problem, that its conclusion runs counter to the data, is otherwise not supported by the data, or that its decision on this factor is otherwise implausible.

## C. Explanation of its finding on invasive plant species

■ Plaintiff argues that "the Service dismissed the impacts of invasive plant species on the [GPD's] range without adequate explanation and thus acted arbitrarily."[73] The 2013 Finding recognizes that invasive plant species are widespread in the GPD's range. It also states that these plants generally have a detrimental effect on native prairie ecosystems and specifically may reduce densities of prairie dogs by decreasing the quality and quantity of their preferred foods. Plaintiff argues that despite these known negative impacts, the Service summarily concluded that any impacts are only local in nature and do not put the GPD at risk for extinction. The court again stresses that, using the method described in the 2013 Finding and the 2014 Policy, the Service was analyzing the threats to the species at a range-wide level first, and, as was the case with agricultural land conversion, Plaintiff fails to point to

---

68. Doc. 100 at p. 14; 16 U.S.C. § 1533(a)(1).

69. An examination of any portion of the range takes place after the range-wide analysis and depends on whether there is a concentration of threats present in any one area.

70. 78 Fed.Reg. at 68,671 (Doc. 75–3 at p. 13).

71. Id.

72. Id.

73. Doc. 76 at p. 25.

any evidence demonstrating a decline in GPD abundance range-wide because of invasive plant species. In other words, while invasive plant species affect the GPD's habitat and thus have the potential to negatively impact the GPD, there is no evidence that the plants are actually doing so on a widespread scale. There is no species-specific research on how invasive species are actually impacting the GPD in particular.[74] Thus, given the data showing the GPD's persistence range-wide, the Service concluded that any negative impacts must only be local in nature.[75] The Service's finding related to invasive plant species is sufficiently explained, does not run counter to evidence in the record, and is not otherwise arbitrary.

## D. Grazing data

■ Plaintiff also argues that the Service's analysis regarding grazing threats to the GPD's habitat is arbitrary because it failed to consider land health assessment ("LHA") data from the Bureau of Land Management ("BLM") that could have provided information regarding site-specific range conditions. Plaintiff argues that the Service inaccurately noted in its 2013 Finding that there was no information about site-specific range conditions when, in fact, LHAs are available and could have been considered. Federal Defendants argue that LHAs are not conducted consistently or in a meaningful way to establish cause-and-effect relationships between grazing and the GPD populations. Indeed, the 2013 Finding stated that it lacked information about site-specific range conditions, explaining that the available range condition data is "not collected in a biologically meaningful way that is relevant to small mammals."[76] Instead, the Service relied on other information related to grazing's impact on the GPD that it believed was more reliable.[77] The court does not second-guess this reliability determination; "what constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference."[78]

Plaintiff argues that the Service considered and relied on LHA data in its listing decision for the Gunnison sage-grouse just one year earlier and thus there is no basis for finding such data unreliable now.[79] However, as noted by Federal Defendants, in the Service's final rule on the Gunnison sage-grouse, it recognized the limitations of using LHA data and discounted its usefulness.[80]

■ Even assuming that the LHAs are reliable, there is nonetheless nothing in the record to suggest that any LHA contained relevant information related to the GPD that the Service then ignored. Plaintiff asserts that LHAs assess conditions specifically for "special status species" and because one of the GPD subspecies has been a candidate species, the LHAs should contain relevant data about that subspecies.[81] The Service notes, however, that

---

74. *See W. Watersheds Project,* 948 F.Supp.2d at 1184 (finding that "an evaluation of threats depends on habitat preferences and species-specific characteristics").

75. The Service would then only consider those localized impacts in a particular region if there were a concentration of threats in that region and that region had biological significance as more thoroughly described in the 2013 Finding and the 2014 Policy.

76. 78 Fed.Reg. at 68,672 (Doc. 75–3 at p. 14).

77. *See* Doc. 100–4 at p. 20, ¶ 90.

78. *San Luis v. Delta–Mendota Water Auth. v. Locke,* 776 F.3d 971, 995 (9th Cir.2014).

79. 78 Fed.Reg. 2486, 2500 (Jan. 11, 2013).

80. Doc. 100–4 at p. 28, ¶ F.

81. Only the *C.g. gunnisoni* subspecies of the GPD was ever deemed to be a candidate species under the ESA and thus the LHA would not necessary contain any helpful data

Plaintiff did not present any LHA to the Service for its consideration despite the opportunity to do so, and the BLM did not submit any LHA when the Service asked for information in regards to the GPD listing. Therefore, nothing in the record supports Plaintiff's argument that LHAs contain relevant information, much less information that will provide a better understanding about the impact of grazing on GPDs.[82] The court must defer to the agency's conclusion here.

### E. Reversal of the 2008 Finding

■ In 2008, the Service found that listing the "montane" portion of the GPD's range was warranted but precluded. That finding was subsequently invalidated, and the Service was instructed to make a new 12–month finding. By 2013, the Service had arrived at a different conclusion about *C.g. gunnisoni*, the GPD subspecies living in the montane portions of the GPD's range. Plaintiff challenges this reversal, arguing that it is not based on new information. The Service argues that, to the contrary, the differing outcome is based on newly available studies, occupancy data, and information presented by experts in a species status workshop in May of 2013 and that its new conclusions are supported by substantial evidence.

In the 2008 Finding the Service based its conclusion—that the montane portion of the GPD warranted protection under the ESA—on the threat posed to the GPD in its montane region by the sylvatic plague.[83] By 2013, however, the Service changed its conclusion, explaining that "[n]ew research has improved our understanding of how plague is transmitted."[84] While the 2013 Finding still recognizes that there are lower occupancy rates for the *C.g. gunnisoni* than the *C.g. zuniensis*, it states that the new occupancy data and other findings caused the Service to conclude that the lower numbers are not due to the fact that the *C.g. gunnisoni* is more susceptible to the plague as was previously thought. It explains the evidence supporting its new conclusion. For example, it points to new evidence showing that the greater presence of fleas in montane areas does not necessarily mean that the GPDs in those areas will be more prone to the plague and that the more isolated nature of the subspecies may actually provide some protection from the plague. The 2013 Finding explains the new research and how that research, coupled with a new set of occupancy data from 2010 showing another three years of stability in both subspecies of GPD, caused the Service to come to a different conclusion regarding the threat of plague on the *C.g. gunnisoni*.[85]

Federal Defendants point to evidence in the record that provides a reasonable basis for the Service's conclusion that, despite the lower occupancy numbers, the subspecies is stable and rebounding.[86] As Feder-

---

about the *C.g. zuniensis,* the other subspecies of the GPD.

**82.** Federal Defendants go one step further and assert that the LHAs in fact do not contain any information about GDPs. They assert that "[s]ince 2008, only one LHA report has even mentioned the GPDs as occurring in the assessment area" and that report did not provide a GPD habitat assessment, in part because the GPDs were deemed to be *C.g. zuniensis,* which have never been a candidate species." Doc. 100 at p. 21. While this may be true and would provide further support for

Federal Defendant's argument that the Service used the best available data and that LHA data would not have resulted in any different decision, there is no support for this statement in the record.

**83.** Doc. 75–2 at ¶ 47; Doc. 82 at p. 21 at ¶ 5.

**84.** 78 Fed.Reg. at 68,676 (Doc. 75–3 at p. 18).

**85.** *Id.*

**86.** Doc. 100 at p.17.

al Defendants assert, occupancy data does not show declines, and thus its new conclusion that the plague is not threatening the *C.g. gunnisoni* is at least reasonable here. That is, the Service relied on evidence that a reasonable mind might accept as adequate to support its conclusions.[87] "Assessing a species' likelihood of extinction involves a great deal of predictive judgment. Such judgments are entitled to particularly deferential review." [88]

## VI. CONCLUSION

Based on the preceding discussion, the Plaintiff's Motion for Summary Judgment at docket 75 is **DENIED,** and the Federal Defendant's Motion for Summary Judgment at docket 81 is **GRANTED.**

**87.** *See San Luis & Delta–Mendota Water Auth. v. Jewell,* 747 F.3d 581, 601 (9th Cir.2014).

**88.** *Trout Unlimited,* 559 F.3d at 959.