**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COUNTY OF AMADOR, California,
*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR; RYAN K. ZINKE,
Secretary of the United States
Department of Interior; KEVIN K.
WASHBURN, Acting Assistant
Secretary of Indian Affairs, United
States Department of Interior,
*Defendants-Appellees*,

IONE BAND OF MIWOK INDIANS,
*Intervenor-Defendant-Appellee.*

No. 15-17253

D.C. No.
2:12-cv-01710-
TLN-CKD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Judge, Presiding

Argued and Submitted July 14, 2017
San Francisco, California

Filed October 6, 2017

Before:  Susan P. Graber and Michelle T. Friedland, Circuit Judges, and Jeremy D. Fogel,[*] District Judge.

Opinion by Judge Graber

---

## SUMMARY[**]

---

### Tribal Issues

The panel affirmed the district court's summary judgment in favor of the U.S. Department of the Interior and the Ione Band of Miwok Indians in a case involving a proposed casino in Amador County, California, and the County's challenge to a Department of the Interior 2012 record of decision in which the agency announced its intention to take land into trust – the Plymouth Parcels – for the benefit of the Ione Band, and to allow the Ione Band to build a casino complex on the land.

In *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009), the U.S. Supreme Court ruled that a tribe must have been "under Federal jurisdiction" at the time the Indian Reorganization Act ("IRA") was enacted in 1934 in order to qualify to have lands taken into trust for its benefit.

The panel held that a tribe qualifies to have land taken into trust for its benefit under 25 U.S.C. § 5108 of the IRA if

---

[*] The Honorable Jeremy D. Fogel, United States District Judge for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

it *was* "under Federal jurisdiction" as of June 18, 1934, and *is* "recognized" at the time the decision was made to take land into trust. The panel also held that the Department of the Interior did not err in determining that the Ione Band was "under Federal jurisdiction" at the time that the IRA became law in 1934.

Finally, the panel held that Department of the Interior did not err in allowing the Ione Band to conduct gaming operations on the Plymouth Parcels under the "restored tribe" exception of the Indian Gaming Regulatory Act. The panel held that the agency's decision to grandfather in the Ione Band under 25 C.F.R. § 292.26(b) was permissible.

## COUNSEL

Christopher E. Skinnell (argued) and James R. Parrinello, Nielsen Merksamer Parrinello Gross & Leoni LLP, San Rafael, California; Cathy A. Christian, Nielsen Merksamer Parrinello Gross & Leoni LLP, Sacramento, California; for Plaintiff-Appellant.

John L. Smeltzer (argued), Katherine J. Barton, and Judith Rabinowitz, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Matthew Kelly, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Jerome L. Levine (argued) and Timothy Q. Evans, Holland & Knight LLP, Los Angeles, California, for Intervenor-Defendant-Appellee.

**OPINION**

GRABER, Circuit Judge:

This case involves a dispute over a proposed casino in Amador County, California. Plaintiff, the County of Amador ("County"), challenges a 2012 record of decision ("ROD") issued by the United States Department of the Interior ("Interior") in which the agency announced its intention to take land into trust for the benefit of the Ione Band of Miwok Indians ("Ione Band" or "Band"). The ROD also allowed the Ione Band to build a casino complex and conduct gaming on the land once it is taken into trust. Reviewing Interior's decision under the Administrative Procedure Act ("APA"), we conclude that the agency did not err. Accordingly, we affirm the district court's award of summary judgment to Interior and the Ione Band.

**FACTUAL AND PROCEDURAL HISTORY**

Amador County is located roughly 45 miles southeast of Sacramento in the foothills of the Sierra Nevada Mountains. The county is rural, with a population density well below the state average, and it contains just five incorporated cities.

The Ione Band's origins lie in the amalgamation of several "tribelets" indigenous to Amador County and the surrounding area. The tribelets, which included the Northern Sierra Miwok and the Wapumne, were independent, self-governing groups that maintained their own territories but regularly interacted with one another. The political and geographic lines separating the tribelets began to erode in the 18th and early 19th centuries, as Spanish and Mexican missionary efforts and the arrival of white settlers in the area

decimated the Native American population and displaced many villages. The discovery of gold in the area in 1848 and the subsequent inpouring of miners and prospectors accelerated the process of amalgamation. For instance, the Foothill Nisenan living in the American River drainage were displaced by miners and were forced to move south, where they joined with Plains Miwok and Northern Sierra Miwok.

Conflicts arose between the miners and settlers who flooded into California beginning in 1848, on the one hand, and the Native Americans already in the vicinity, on the other. The federal government tried to ameliorate the situation by convincing Native Americans to give up their lands and move to "safer" areas. In 1851, federal agents negotiated 18 treaties with Native Americans that required such resettlement. One of those treaties—Treaty J—was signed by members of some of the tribelets that would eventually blend together to form the Ione Band. Treaty J set aside land for those tribelets in what is now Amador County. The land, which included the site of the proposed casino, was to be "set apart forever for the sole use and occupancy of the tribes whose representatives signed the treaty." Neither Treaty J nor any of the other treaties ever went into effect, however. The California legislature, which opposed the assignment of the lands to Native Americans, successfully lobbied against the treaties and, in 1852, the United States Senate voted not to ratify the treaties. Larisa K. Miller, *The Secret Treaties With California's Indians*, Prologue Magazine, Fall/Winter 2013.

Throughout the latter half of the 19th century, Native Americans in the Amador County area continued to be displaced by white settlers. By 1900, most Native Americans lived either in remote settlements or on the edges of towns.

They were largely destitute and often lacked permanent homes. Congress felt that California was largely responsible for this state of affairs and would have to play a primary role in addressing the problem of the "landless Indians," but its position changed in 1905 when the 18 unratified treaties from the 1850s were brought to light. *Id.* The treaties had been printed "in confidence" in 1852 and could not be accessed by the public from the Senate archives, so they had been largely forgotten. *Id.* at 43. Two activists convinced Senator Thomas Bard of California to have the treaties printed. After he did, Congress was forced to acknowledge the role that it had played in creating the problem of landless Indians in California. *Id.* Capitalizing on the change in sentiment among his colleagues, Senator Bard proposed an amendment to the Indian Appropriations Act of 1905 that authorized the Secretary of the Interior ("Secretary") to "investigate . . . existing conditions of the California Indians and to report to Congress . . . some plan to improve the same." Pub. L. No. 58-212, 33 Stat. 1048, 1058 (1905).

The Secretary tasked C.E. Kelsey with conducting the investigation into the condition of Native Americans in California. In Kelsey's 1906 report to the Commissioner of Indian Affairs, he recommended that Native Americans in Northern California who were "landless through past acts [or] omissions of the National Government . . . receive land in lieu of any claims they may have against the Government, moral or otherwise; that the land . . . be of good quality with proper water supply, and . . . be located in the neighborhoods in which the Indians wish to live." *Indian Tribes of California: Hearings Before a Subcomm. of the H. Comm. on Indian Affairs*, 66th Cong. 131, at 23–24 (1920) (Report of the Special Agent for California Indians to the Commissioner of Indian Affairs, Mar. 21, 1906). The Commissioner, in turn,

recommended to Congress that it appropriate money to carry out Kelsey's plan. Congress responded by appropriating $100,000 in 1906 for the purchase of land in California for "Indians . . . now residing on reservations which do not contain land suitable for cultivation, and for Indians who are not now upon reservations." Pub. L. No. 59-258, 34 Stat. 325, 333 (1906). Congress continued to appropriate money for that purpose almost every year until the passage of the Indian Reorganization Act in 1934 made such annual appropriations unnecessary. William Wood, *The Trajectory of Indian Country in California: Rancherías, Villages, Pueblos, Missions, Ranchos, Reservations, Colonies, and Rancherias*, 44 Tulsa L. Rev. 317, 357–58 (2008).

Kelsey also prepared a census of non-reservation Indians living in California. That census served as a guide for John Terrell, a Special Agent with Interior's Bureau of Indian Affairs who traveled to California in 1915. Terrell was to assess which groups of Indians were in need of land and was to negotiate purchases of land for their benefit. Terrell visited the Native Americans living near Ione and counted some 101 members of the Ione Band, including Charlie Maximo, the recently elected Chief of the Band. In a May 1915 letter to the Commissioner of Indian Affairs, Terrell wrote that, "[o]f all the Indians I have visited," the members of the Ione Band "have stronger claims to their ancient Village than any others." After visiting the Band, Terrell almost immediately set about trying to buy some of the land on which the Band resided, for use as a permanent home for the Band.

In August 1915, Terrell reached an agreement for the purchase of 40 acres at a total price of $2,000. But the purchase stalled because of problems with the title to the property. For years, various officials with Interior tried to

close the deal, but with no success.  In a July 1923 letter, one Interior official wrote that the agency "ha[d] tried very hard for five years to get this sale through because . . . [the Ione Band], if dispossessed, would be placed in such shape as to call forth untold criticism by all people knowing the circumstances of their occupation of this land as homesites for years."  A different Interior official wrote, in a January 1924 letter, that the deal was "all but closed."  More than five years later, though, the transaction still had not been consummated.  As one official wrote to a member of the Band in a May 1930 letter, "[w]e have for more than eight years been negotiating with owners of the [land] for the purpose of purchasing same, but because of our inability to get a clear title to the land, the deal has not been closed."

In 1934, Congress enacted the Indian Reorganization Act ("IRA").

> The IRA was designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains.  Native people were encouraged to organize or reorganize with tribal structures similar to modern business corporations.  A federal financial credit system was created to help tribes reach their economic objective.  Educational and technical training opportunities were offered, as were employment opportunities through federal Indian programs.

*Cohen's Handbook of Federal Indian Law* § 1.05, at 81 (Nell Jessup Newton ed., 2012) [hereinafter *Cohen's Handbook*]. Relevant to this case, the IRA gave the Secretary of the Interior the power to take land into trust for a tribe's use.

In 1972, the California Rural Indian Land Project, acting on behalf of the Band, asked the federal government to accept title to the same 40-acre tract that the government had tried to buy years earlier and to hold the land in trust for the Band. In October of that year, Robert Bruce, the Commissioner of Indian Affairs, agreed to do so. In his letter to the Band, Bruce wrote:

> Federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated. As stated earlier, they . . . are eligible for the purchase of land under [the IRA].

The federal government did not take the land into trust at that time, however, because several officials within Interior questioned Commissioner Bruce's conclusion that the Ione Band was eligible to have land taken into trust for its benefit under the IRA. In 1973, for instance, the Deputy Assistant Secretary of the Interior wrote a letter stating that "[t]he former contemplated purchase of land for [the Ione Band] by the United States may indicate that they are a recognizable group entitled to benefits of the [IRA]. We have no correspondence, however, from the group requesting recognition or a desire to establish a reservation. . . . If the Band desires and merits Federal recognition, action should be taken to assist them to perfect an organization under the provisions of the [IRA]."

In 1978, Interior promulgated what are known as the "Part 83" regulations, 25 C.F.R. pt. 83[1]  "The purpose of [the Part 83 regulations] [wa]s to establish a departmental procedure and policy for acknowledging that certain American Indian tribes exist.  Such acknowledgment of tribal existence . . . is a prerequisite to the protection, services, and benefits from the Federal Government available to Indian tribes," including the benefits of the IRA.  Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39,361-01, 39,362 (Aug. 24, 1978).  "Prior to 1978, Federal acknowledgment was accomplished both by Congressional action and by various forms of administrative decision. . . .  The [Part 83] regulations established the first detailed, systematic process for review of petitions from groups seeking Federal acknowledgment."  Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 59 Fed. Reg. 9280-01, 9280 (Feb. 25, 1994).

Following the promulgation of the Part 83 regulations, Interior began to take the position that the Band had not yet been recognized by the federal government and that it had to proceed through the Part 83 regulations if it wished to be recognized.  When the Band sued the federal government in 1990, for instance, the government took the position that the Band was *not* a recognized tribe.

But in 1994, the federal government changed its mind about the Band's "recognized" status.  In a March 1994 letter to the Chief of the Band, Assistant Secretary of Indian Affairs

---

[1] The regulations were initially designated as 25 C.F.R. part 54, but they were later redesignated without textual change as 25 C.F.R. part 83. Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 59 Fed. Reg. 9280-01, 9280 (Feb. 25, 1994).

Ada Deer "reaffirm[ed] the portion of Commissioner Bruce's [1972] letter" that stated that "Federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated." Assistant Secretary Deer further ordered that the Ione Band be included on the official list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," which was published in the Federal Register. The Band was included on the list beginning in 1995.

Meanwhile, Congress passed the Indian Gaming Regulatory Act ("IGRA") in 1988. Section 20 of IGRA limits "gaming . . . on lands acquired by the Secretary in trust for the benefit of an Indian tribe after the date of enactment of" the statute, allowing gaming in just a few circumstances. Pub. L. No. 100-497, § 20, 102 Stat. 2467, 2485–86 (1988), *codified at* 25 U.S.C. § 2719(a). One such circumstance exists when "lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii).[2] That exception is called the "restored tribe" or "restored lands of a restored tribe" exception.

In September 2004, the Band submitted a request to the National Indian Gaming Commission ("Gaming

---

[2] "Indian tribe" is defined in IGRA as "any Indian tribe, band, nation, or other organized group or community of Indians which (A) is recognized as eligible by the Secretary for the special programs and services provided by the United States to Indians because of their status as Indians, and (B) is recognized as possessing powers of self-government." 25 U.S.C. § 2703(5).

Commission")[3] for an Indian lands determination—a ruling as to the eligibility of land to be used for gaming—regarding some land known as the Plymouth Parcels. While that request was pending, the Band submitted a "fee-to-trust" application to Interior, asking that the Secretary accept trust title to the Plymouth Parcels. Under then-applicable Interior practice, a fee-to-trust application seeking to use the newly acquired lands for gaming under the "restored tribe" exception of IGRA required "[a] legal opinion from the Office of the Solicitor concluding that the proposed [land] acquisition" came within the exception, and the Indian lands determination would constitute such a legal opinion. Pursuant to a memorandum of agreement between the Gaming Commission and Interior, the Associate Solicitor in Interior's Division of Indian Affairs prepared an Indian lands determination in September 2006 ("2006 Determination"). The Associate Solicitor concluded that "Assistant Secretary Deer's [1994] . . . reaffirmation of Commissioner Bruce's [1972] position amounts to a restoration of the Band's status as a recognized Band. Under the unique history of its relationship with the United States, the Band should be considered a restored tribe within the meaning of IGRA." The Associate Deputy Secretary for Indian Affairs concurred in that determination and notified the Band of his concurrence later in September 2006.[4] After receiving the 2006

---

[3] The Gaming Commission "is a federal regulatory agency, created by IGRA, that oversees the business of Indian gaming in order to ensure its lasting integrity." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 716 n.6 (9th Cir. 2003).

[4] The County notes that, "[i]n January 2009, Department Solicitor David Bernhardt sent a memorandum to George Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development, withdrawing the [2006 Determination]." Bernhardt told Skibine that he was

Determination, the Band continued to pursue its fee-to-trust application.

Over the next few years, Interior engaged in an internal dispute about the correctness of the 2006 Determination. While that was occurring, the Supreme Court decided *Carcieri v. Salazar*, 555 U.S. 379 (2009), a case that concerned the meaning of the phrase "recognized Indian tribe now under Federal jurisdiction" in the IRA. The Court ruled that a tribe must have been "under Federal jurisdiction" at the time the IRA was enacted (1934) in order to qualify to have lands taken into trust for its benefit. *Id.* at 395.

In May 2012, Interior issued the relevant ROD, in which it announced its intention to take the Plymouth Parcels into trust for the Band and approved the Band's plan to build a gaming complex on the Plymouth Parcels. The agency concluded, in relevant part, that (1) the Ione Band was under federal jurisdiction in 1934 and was thus eligible to have land taken into trust under the statute, and that (2) the Plymouth Parcels could be used for gaming under the "restored tribe"

---

"withdraw[ing] and . . . reversing that opinion" and that the opinion "no longer represents the legal position of the Office of the Solicitor. The opinion of the Solicitor's Office is that the Band is not a restored tribe within the meaning of IGRA." That is true but, as Interior points out, the "County does not challenge the 2006 Determination based on the purported 2009 withdrawal." That silence probably results from the fact that, "in 2011, Solicitor Hilary Tompkins reaffirmed the 2006 Determination[] after concluding that neither Bernhardt's circulation of his draft legal opinion nor his issuance of a memorandum regarding it to the Acting Deputy Assistant Secretary had the effect of withdrawing or reversing it."

exception of IGRA. The ROD was signed by Donald Laverdure, the Acting Assistant Secretary of Indian Affairs.[5]

In June 2012, the County sued Interior[6] in district court under the APA, challenging both the agency's decision to take the Plymouth Parcels into trust and its conclusion that the land could be used for gaming under the "restored tribe" exception of IGRA. The Ione Band intervened in each case, on the side of Interior. In 2015, the district court granted summary judgment to Interior and the Band and denied the County's motion for summary judgment. The County timely appeals.

## STANDARD AND SCOPE OF REVIEW

We review de novo the district court's summary judgment rulings, "thus reviewing directly the agency's action under the [APA's] arbitrary and capricious standard." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1217 (9th Cir. 2015) (internal quotation marks omitted). "In general, a court

---

[5] Laverdure was serving as the Principal Deputy Assistant Secretary of Indian Affairs before Assistant Secretary Larry Echo Hawk's resignation. Laverdure was thus "the first assistant to the office" of the Assistant Secretary of Indian Affairs. *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009) (per curiam). Accordingly, Laverdure assumed the duties of the Assistant Secretary *automatically* upon Echo Hawk's resignation. *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 557 (9th Cir. 2016). Those duties included taking land into trust under the IRA, a duty that had been delegated to the Assistant Secretary. Accordingly, Laverdure was empowered to take the Plymouth Parcels into trust.

[6] The County named Interior, the Secretary of the Interior, and the Acting Assistant Secretary of Indian Affairs as defendants. We refer to them collectively as "Interior."

reviewing agency action under the APA must limit its review to the administrative record." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014).

## DISCUSSION

Interior's decision to take the Plymouth Parcels into trust for the Ione Band rested on two key determinations, each of which the County challenges. First, Interior determined that the Ione Band qualifies to have land taken into trust for its benefit under the IRA because the Band is now "recognized" and was "under Federal jurisdiction" in 1934 when the IRA took effect. Second, Interior determined that the Ione Band may conduct gaming on the Plymouth Parcels under the "restored lands of a restored tribe" provision of IGRA. We address those issues in turn.

**A.** *"Recognized Indian Tribe Now Under Federal Jurisdiction"*

The IRA provides that the Secretary of the Interior may take land into trust "for the purpose of providing land for Indians." 25 U.S.C. § 5108. The statute defines "Indian" to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." *Id.* § 5129. In *Carcieri*, the Court held that the "temporal restrictions that apply to [the] definition of 'Indian'" in § 5129 limit the set of tribes that can have land taken into trust for their benefit under § 5108. 555 U.S. at 393. The Court also held that "the term 'now under Federal jurisdiction' . . . unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." *Id.* at 395. Accordingly, the Secretary may take land into trust for the Ione Band only if it

was "under Federal jurisdiction" at the time that the IRA was passed.[7]

*Carcieri* left several questions unanswered, two of which the parties dispute. First, need a tribe have been "recognized" in 1934, as well as "under Federal jurisdiction" in 1934, in order to benefit from the IRA, or can recognition occur at any time? We will call this the "timing-of-recognition issue." Second, what does it mean for a tribe to have been "under Federal jurisdiction" in 1934?[8]

---

[7] Section 5129 contains two additional definitions of "Indian," but they are not relevant to this case.

[8] There is a third question left open by *Carcieri*: Are the "now under Federal jurisdiction" and "recognized" requirements even distinct, or do they comprise a single requirement? The Court in *Carcieri* did not explicitly hold that the two requirements are distinct but, as Justice Souter noted in his opinion, "[n]othing in the majority opinion forecloses the possibility that the two concepts, recognition and jurisdiction, may be given separate content." *Carcieri*, 555 U.S. at 400 (Souter, J., concurring in part and dissenting in part). We think that the better reading of the statute is that "recognition" and being "under Federal jurisdiction" are distinct requirements, for two reasons. First, statutes should be construed so as to "give effect, if possible, to every clause and word." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 111 (2012) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Second, the phrase "now under Federal jurisdiction" was added to the statute during the drafting process. *To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearings Before the Comm. on Indian Affairs on S. 2755 and 3645*, 73d Cong. 264 (1934). If "under Federal jurisdiction" meant the same thing as "recognized," then the only effect of the addition would have been to fix the recognition time at "now"—that is, 1934. But that goal could have been accomplished simply by adding the word "now" in front of "recognized." The fact that an entirely new phrase was added suggests that the change was intended to do more than fix the time of recognition at 1934 and that the added new phrase, "under Federal

### 1. The Timing-of-Recognition Issue

The parties' first dispute is over the timing-of-recognition issue.[9]  The County argues that the phrase "now under Federal jurisdiction" modifies the entire phrase "recognized Indian tribe," so that a tribe must have been recognized in 1934 in order to benefit from the statute.[10]  Interior and the Band, on the other hand, argue that "recognized" and "now under Federal jurisdiction" separately modify "Indian tribe," so that recognition can occur at any time before land is taken into trust.

Both arguments are plausible because, as one of our sister circuits has held, the IRA is ambiguous with respect to the timing-of-recognition issue. *Grand Ronde*, 830 F.3d at 560. That is, even after applying the usual tools of statutory

jurisdiction," was understood to mean something different than "recognized." *Cf. Zachary v. Cal. Bank & Tr.*, 811 F.3d 1191, 1198–99 (9th Cir. 2016) (rejecting a statutory construction that reflected a policy choice that Congress could have made "in a far more straightforward manner").

[9] The County does not dispute that the Band is presently recognized.

[10] We reject the County's argument that the Supreme Court already resolved the timing-of-recognition issue in *Carcieri*.  As the D.C. Circuit has observed, *Carcieri*'s "holding reaches only the temporal limits of the Federal-jurisdiction prong" of § 5129. *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell* (*Grand Ronde*), 830 F.3d 552, 559–60 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1433 (2017).  And to the extent that the Court said anything about the timing-of-recognition issue in *United States v. John*, 437 U.S. 634 (1978), its statements were unreasoned dicta that are entitled to little weight. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("We do not treat *considered* dicta from the Supreme Court lightly." (emphasis added)).

construction, the statute does not yield a *clear* answer as to Congress' intent on the timing-of-recognition issue. The statute reasonably can be read to limit its benefits to tribes that were recognized in 1934, or it reasonably can be read to extend benefits to later-recognized tribes, provided that those tribes were "under Federal jurisdiction" in 1934.[11]

Interior is the agency that Congress designated to administer the IRA. *Grand Ronde*, 830 F.3d at 559; *United States v. Eberhardt*, 789 F.2d 1354, 1359–60 (9th Cir. 1986). Interior argues that its resolution of the timing-of-recognition issue is entitled to deference under *Chevron*.[12] But we need not decide whether *Chevron* deference (or any other level of deference) is appropriate, because we reach the same conclusion as Interior when we review the timing-of-recognition issue de novo. The phrase "recognized Indian tribe now under Federal jurisdiction," when read most naturally, includes all tribes that are currently—that is, at the moment of the relevant decision—"recognized" and that were "under Federal jurisdiction" at the time the IRA was passed.

---

[11] Of course, those two interpretations of the statute need not be equally plausible or reasonable to give rise to "ambiguity" within the meaning of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").

[12] As Interior points out, the D.C. Circuit and several district courts have deferred to the agency under *Chevron* on the timing-of-recognition issue. *See, e.g.*, *Grand Ronde*, 830 F.3d at 559–63.

In addition to exploring the text of the statute itself, we examine the relevant statutory context.  When construing a statutory provision, we must "bear[] in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regulatory Grp. v. EPA* 134 S. Ct. 2427, 2441 (2014) (internal quotation marks omitted).  "The meaning . . . of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  Unfortunately, though, contextual clues are of little value in understanding the phrase at issue.

Section 5129 provides "three discrete definitions" of "Indian": "[1] members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . . [3] all other persons of one-half or more Indian blood." *Carcieri*, 555 U.S. at 391–92 (alterations in original) (quoting 25 U.S.C. § 5129).  As the D.C. Circuit recognized in *Grande Ronde*, the second and third definitions of "Indian" in § 5129 do not shed much light on the meaning of the first definition.  *See* 830 F.3d at 561 ("Appellants do not believe a descendant of a tribe recognized in 2002 could have lived on a reservation in 1934.  That assumption is incorrect, for . . . recognition that occurs after 1934 simply means, in retrospect, that any descendant of a Cowlitz Tribal member who was living on an Indian reservation in 1934 then met the IRA's second definition.").

Nor does the remainder of the IRA illuminate the timing-of-recognition issue.  As noted, § 5129 is a definitional section, so the remainder of the statute simply uses the terms

defined in § 5129 and is coherent whether or not those terms include later-recognized tribes.

We next examine the purpose and history of the IRA. *See Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) ("[W]e must (as usual) interpret the relevant words [in a statute] not in a vacuum, but with reference to the statutory . . . history[] and purpose." (internal quotation marks omitted)). "Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country . . . ." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 861 (2005) (citation omitted). And understanding the historical context in which a statute was passed can help to elucidate the statute's purpose and the meaning of statutory terms and phrases. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) ("The text of [the provision], interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole, unambiguously bars cost considerations . . . , and thus ends the matter for us . . . .").

The IRA represented the culmination of a "marked change in attitude toward Indian policy" that began in the mid-1920s. *Cohen's Handbook* § 1.05, at 79. The "prior policy of allotment[13] sought 'to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large.'" *Grand Ronde*, 830 F.3d at 556 (quoting *County of Yakima v.*

---

[13] Under the allotment policy, Native Americans "surrendered their undivided interest in the tribally owned common or trust estate for a personally assigned divided interest, generally held in trust for a limited number of years, but 'allotted' to them individually." *Cohen's Handbook* § 1.04, at 72.

*Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992)).  The new policy, by contrast, reflected "more tolerance and respect for traditional aspects of Indian culture," *Cohen's Handbook* § 1.05, at 79, and rested "on the assumption . . . that the tribes not only would be in existence for an indefinite period, but that they *should* be," William C. Canby, Jr., *American Indian Law in a Nutshell* 25 (6th ed. 2014).  As the "crowning achievement" of the new policy, *Cohen's Handbook* § 1.05, at 81, the IRA was intended "to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically," *Morton v. Mancari*, 417 U.S. 535, 542 (1974).  To a large extent, the IRA was intended to undo the damage wrought by prior policies—"to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quoting H.R. Rep. No. 73-1804, at 6 (1934)).

In 1934, when Congress enacted the IRA, there was no comprehensive list of recognized tribes, nor was there a "formal policy or process for determining tribal status." William Wood, *Indians, Tribes, and (Federal) Jurisdiction*, 65 U. Kan. L. Rev. 415, 429–30 (2016); *accord Cohen's Handbook* § 3.02[7][a], at 153 (noting "the history of inconsistent, vague, and contradictory policies surrounding the recognition of tribes").  It seems unlikely that Congress meant for the statute's applicability to a particular tribe to turn on whether that tribe happened to have been recognized by a government that lacked a regular process for such recognition.  It seems more likely that Congress intended the statute to benefit all tribes, whenever recognized, provided

that those tribes were "under Federal jurisdiction" as of the date when the IRA was enacted.

Next, we consider the drafting history of the statute. As we have already noted, an earlier draft of the statute extended benefits to "all persons of Indian descent who are members of any recognized Indian tribe." The best reading of that version of the statute would have been that "recognition" could occur at any time. The phrase "now under Federal jurisdiction" was a free-standing addition. Its apparent purpose was simply to exclude those tribes that were not at that time under federal jurisdiction.

Finally, we consider Interior's history of administering the IRA. We "give an agency's . . . practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States*, 495 U.S. 472, 484 (1990); *see also United States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1097 (9th Cir. 2000) (stating that an agency's "practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work as efficiently and smoothly while they are yet untried and new." (quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933))). A court should hesitate before construing a statute in a way that renders years of consistent agency practice unlawful. *See, e.g.*, *Baur v. Mathews*, 578 F.2d 228, 233 (9th Cir. 1978) ("The administrative agency clothed with responsibility for implementing congressional pronouncements is generally well acquainted with the policy of the statute it administers. This is particularly true when the agency has long been involved in the . . . administration of a given statute or its predecessors.").

Pre-*Carcieri* "administrative practice . . . treated all federally recognized tribes as entitled to have land taken into trust under the IRA, so long as those tribes were recognized as of the time the land was placed in trust." *Cohen's Handbook* § 3.02[6][d], at 149. Even in the early years of the administration of the statute, Interior's practice allowed for post-1934 recognition. In 1937, for instance, Interior recognized the Mole Lake Indians of Wisconsin as a tribe that was entitled to the IRA's benefits. 1 Dep't of Interior, *Opinions of the Solicitor Relating to Indian Affairs, 1917–1974*, at 725 (Feb. 8, 1937); *see also Carcieri*, 555 U.S. at 399 (Breyer, J., concurring) ("[T]he Department in the 1930's thought that an anthropological study showed that the Mole Lake Tribe no longer existed. But the Department later decided that the study was wrong, and it then recognized the Tribe."). Furthermore, none of the Solicitor's Opinions issued in the mid-to-late 1930s concerning whether a tribe qualified for the benefits of the IRA "contain[ed] any suggestion that it [was] improper to determine the status of a tribe after 1934." Memorandum from Assoc. Solicitor to the Assistant Sec'y of Indian Affairs 7 (Oct. 1, 1980) (Request for Reconsideration of Decision Not to Take Land in Trust for the Stillaguamish Tribe). In short, Interior's longstanding, consistent practice of allowing tribes recognized after the passage of the IRA to benefit from the statute supports its reading of the statute.

Given the IRA's text, structure, purpose, historical context, and drafting history—and Interior's administration of the statute over the years—the better reading of § 5129 is that recognition can occur at any time. We therefore hold that a tribe qualifies to have land taken into trust for its benefit under § 5108 if it (1) *was* "under Federal jurisdiction" as of

June 18, 1934, and (2) *is* "recognized" at the time the decision is made to take land into trust.

## 2. The Meaning of "Under Federal Jurisdiction"

The County next challenges Interior's determination that the Ione Band was "under Federal jurisdiction" at the time that the IRA became law. The County's first argument in support of that challenge is that Interior's interpretation of the phrase "under Federal jurisdiction" is incorrect.

In the ROD, Interior applied the following two-part test to determine whether the Band was "under Federal jurisdiction" in 1934:

> [W]e construe the phrase "under federal jurisdiction" as entailing a two-part inquiry. The first part examines whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction, *i.e.*, whether the United States had, in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions—through a course of dealings or other relevant acts for or on behalf of the tribe or in some instances tribal members—that are sufficient to establish or that generally reflect Federal obligations, duties, responsibility for or authority over the tribe by the Federal Government. Some Federal actions may in and of themselves demonstrate that a tribe was under Federal jurisdiction or a variety of actions when viewed in concert may achieve the same result.

. . . .

Once having identified that the tribe was under Federal jurisdiction at or before 1934, the second part ascertains whether the tribe's jurisdictional status remained intact in 1934. . . . [T]he longer the period of time prior to 1934 in which the tribe's jurisdictional status is shown, and the smaller the gap between the date of the last evidence of being under Federal jurisdiction and 1934, the greater likelihood that the tribe retained its jurisdictional status in 1934.

Interior and the Band argue that this interpretation of "under Federal jurisdiction" is entitled to *Chevron* deference.

The County disagrees with Interior and the Band both about the meaning of "under Federal jurisdiction" and about the level of deference owed to the agency. According to the County, "in 1934[,] federal jurisdiction over Indians unambiguously went hand-in-hand with federally-supervised land reserved for those Indians, at least where there was no valid treaty in effect." Because the meaning of the phrase is clear, argues the County, Interior's contrary interpretation is not owed *Chevron* deference.

We need not decide whether *Chevron* deference is owed to the agency because, once again, we reach the same conclusion as the agency even without it. Even if we do not owe *Chevron* deference to Interior's interpretation of "under Federal jurisdiction," that interpretation "certainly may influence" our analysis. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). The proper amount of such

influence "has been understood to vary with circumstances," *id.* at 228; it depends on "a variety of factors, such as the thoroughness and validity of the agency's reasoning, the consistency of the agency's interpretation, [and] the formality of the agency's action," *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 942 (9th Cir. 2008). We also consider the agency's "relative expertness." *Mead Corp.*, 533 U.S. at 228. Ultimately, the amount of deference—so-called *Skidmore*[14] deference—that we give to an agency's interpretation of a statute ranges "from great respect . . . to near indifference" depending on how those factors play out. *Id.* (citation omitted).

Here, those factors counsel in favor of giving Interior's interpretation "great respect." Interior's reasoning is thorough and careful,[15] and it includes an analysis of the IRA's historical context, legislative history, and purpose. Employing its institutional expertise gleaned from years of administering the IRA, the agency situates the statute in the larger context of the history of Indian law and, in doing so, arrives at an interpretation of "under Federal jurisdiction" that fits with the rest of the statute and makes sense in historical context. Interior adopted its interpretation in a Solicitor's Opinion after issuing the Ione Band ROD, thus evincing its intent to be bound by the interpretation. For those reasons,

---

[14] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

[15] Interior first announced its interpretation of "under Federal jurisdiction" in its record of decision for the fee-to-trust application of the Cowlitz Tribe in 2010. The agency then applied the interpretation to the Ione Band in the 2012 ROD. Accordingly, in deciding how much deference should be given to Interior's interpretation of "under Federal jurisdiction," we consider both records of decision.

we give Interior's interpretation of the phrase "under Federal jurisdiction" great respect.

The phrase "under Federal jurisdiction," considered on its own, does not have an obvious meaning. "Jurisdiction, it has been observed, is a word of many, too many, meanings." *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 774 (9th Cir. 2011) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). One possible meaning of "under Federal jurisdiction" is offered by the County: A tribe was "under Federal jurisdiction" in 1934 only if it lived on "a reservation set aside on its behalf (at least absent a specific treaty or legislation)." Under that interpretation, the IRA's benefits would be limited to tribes that, as of 1934, already had very consequential dealings with the federal government. Another possible meaning that has been suggested is that all tribes that were actually tribes in 1934—that is, all tribes that "continue[d] to exist as . . . distinct Indian communit[ies], such that the [federal government's plenary] Indian affairs jurisdiction attache[d] to them"—were "under Federal jurisdiction" in 1934. Wood, 65 U. Kan. L. Rev. at 422. Under that interpretation, the IRA's benefits would extend to all recognized tribes.

Each of those proposed interpretations has substantial flaws. The trouble with the County's interpretation is that it would effectively render the word "recognized" surplusage. A tribe that lived on a reservation in 1934 was almost certainly "recognized" within any meaning of that term. *See generally Cohen's Handbook* §§ 1.03, 3.02. And a tribe that had entered into a formal arrangement with the federal government of the type cited by the County would almost certainly count as "recognized." *See id.* If Congress had truly understood "now under Federal jurisdiction" to mean

what the County claims that it means, it could have removed "recognized" from the statute with almost no effect.[16]  As for the other interpretation, it gives too little meaning to the phrase "under Federal jurisdiction," because it would encompass nearly every tribe.

The shortcomings of those two interpretations suggest that "under Federal jurisdiction" must mean something more than mere continued existence, but something less than a relationship with the federal government that had already resulted in the setting aside of a reservation or the signing of a formal treaty.  In other words, "under Federal jurisdiction" should be read to limit the set of "recognized Indian tribes" to those tribes that already had *some* sort of significant relationship with the federal government as of 1934, even if those tribes were not yet "recognized."  Such an interpretation ensures that "under Federal jurisdiction" and "recognized" retain independent meaning.  *See United States v. 144,774 pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005) ("It is an accepted canon of statutory interpretation that we must interpret [a] statutory phrase as a whole, giving effect to each word and not interpreting the provision so as to make other provisions meaningless or superfluous.").

Interior's interpretation of "under Federal jurisdiction," which involves an inquiry into "whether the United States had . . . taken an action or series of actions . . . sufficient to establish or that generally reflect[ed] Federal obligations, duties, responsibility for or authority over the tribe by the

---

[16] The only effect of retaining the term "recognized" in that situation would be to exclude from the scope of the IRA those tribes that were "under Federal jurisdiction" as of 1934, but which lost federal recognition after that time.

Federal Government," fits the bill. Interior's interpretation also recognizes that there may be gaps in the history of a tribe's relationship with the United States, but that those gaps do not necessarily mean that a tribe was not "under Federal jurisdiction" at the time that the IRA became law. The interpretation is thus consistent with the observation in *United States v. John*, 437 U.S. 634, 652–53 (1978), that "the fact that federal supervision over [a tribe] has not been continuous" does not "destroy[] the federal power to deal with" that tribe.

In summary, Interior's reading of the ambiguous phrase "under Federal jurisdiction" is the best interpretation. Interior did not err in adopting that interpretation for purposes of deciding whether the Ione Band was "under Federal jurisdiction" as of 1934.

### 3. *Interior's Determination*

The County's second argument in support of its challenge to Interior's "under Federal jurisdiction" determination assumes that Interior's interpretation of the statute is correct. Even assuming that interpretation, the County argues, the agency acted arbitrarily and capriciously in concluding that the Ione Band was "under Federal jurisdiction" as of the effective date of the IRA. We disagree. "[W]here the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious." *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (citation and internal quotation marks omitted).

In the ROD, Interior relied on "[t]he continuous efforts of the United States beginning in 1915 to acquire land for the

Ione Band as a permanent reservation" to conclude that the Band had been "under Federal jurisdiction" in the years leading up to 1934. Interior also found that the government's post-1934 attempts to buy land for the Ione Band showed that the Band's "under Federal jurisdiction" status continued through 1934. The County argues that the government's *failed* attempts to buy land for the Band are insufficient to establish that the Band was "under Federal jurisdiction."

Interior did not act arbitrarily or capriciously in concluding that the federal government's efforts to purchase land for the Band beginning in 1915 suffice to establish that the Band was "under Federal jurisdiction" at some time before 1934. The efforts failed not because of a lack of will on the part of the federal government, but because of problems securing valid title to the land and the stubbornness of the government's negotiating partners. As one Interior official wrote to the Band in 1930, "[w]e have for more than eight years been negotiating with owners of the [land] for the purpose of purchasing same, but because of our inability to get a clear title to the land, the deal has not been closed. . . . The negotiations are still pending and we hope at some reasonably early date to acquire the [land]." The federal government's continued attempts reflected "Federal obligations, duties, responsibility for or authority over" the Band. That the attempts were thwarted by forces outside the government's control is not relevant. The difference between being "under Federal jurisdiction" and not "under Federal jurisdiction" cannot turn on the actions of third-party landowners.

Nor did Interior act arbitrarily or capriciously in concluding that the Ione Band remained "under Federal jurisdiction" when the IRA became effective. A 1941 letter

from an Interior official in California to the Commissioner of Indian Affairs states that efforts to purchase land for the Ione Band resumed in 1935, but that the efforts once again failed, this time because of "mineral rights and values." Given that efforts were made by the federal government on the Band's behalf a few years before and just one year after 1934, it was reasonable for Interior to conclude that the Band's "jurisdictional status remained intact in 1934."

Interior's determination that the Band was "under Federal jurisdiction" as of 1934 was therefore not arbitrary or capricious. And the Band is now recognized. Accordingly, the Band is a recognized Indian tribe that was "under Federal jurisdiction" in 1934, and Interior did not err in concluding that the Band is eligible to have land taken into trust on its behalf under 25 U.S.C. § 5108.

## B. *Grandfathering Under IGRA*

The County next challenges Interior's determination that the Plymouth Parcels qualify as "restored lands of a restored tribe" under IGRA. *See* 25 U.S.C. § 2719(b)(1)(B)(iii). Interior ruled that the Plymouth Parcels qualify under the so-called "grandfather provision" in the IGRA's implementing regulations, 25 C.F.R. § 292.26(b). The County argues, in essence, that the grandfather provision is invalid, at least as applied to the facts of this case. In order to explain why we disagree with the County, we must place the grandfather provision in context.

As mentioned earlier, IGRA severely limits "gaming . . . on lands acquired by the Secretary in trust for the benefit of an Indian tribe after" the date of enactment of the statute. 25 U.S.C. § 2719. But gaming *is* allowed when the "lands are

taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition," *id.* § 2719(b)(1)(B)(iii)—the "restored lands of a restored tribe" or "restored tribe" exception.

IGRA does not define "restored to Federal recognition." But by the time the statute was passed, Interior had already established a mechanism—the Part 83 process—by which unrecognized Indian groups could petition for recognition. *See* 25 C.F.R. pt. 83 (1988) ("The purpose of this part is to establish a departmental procedure and policy for acknowledging that certain American Indian tribes exist. Such acknowledgment of tribal existence by the Department is a prerequisite to the protection, services, and benefits from the Federal Government available to Indian tribes."). That mechanism was put in place in order to "enable [Interior] to take a uniform approach in the[] evaluation" of requests for recognition. Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. at 39,361. Previously, Interior had recognized tribes on a "case-by-case basis at the discretion of the Secretary," *id.*, which had resulted in a "history of inconsistent, vague, and contradictory policies surrounding the recognition of tribes," *Cohen's Handbook* § 3.02[7][a], at 153. Thus, when Congress enacted IGRA in 1988, there existed (1) a formal administrative recognition process *and* (2) some tribes that had been re-recognized outside that process both before and after the effective date of Part 83.

In 1994, when Assistant Secretary of Indian Affairs Ada Deer "reaffirmed" the Band's status as a recognized tribe and directed that the Band be included on the list of recognized tribes published by Interior, the Band was effectively recognized without having to go through the Part 83 process.

Later that year, Congress passed the Federally Recognized Indian Tribe List Act of 1994 ("Tribe List Act"), which required Interior to publish a definitive list of recognized tribes annually. Pub. L. No. 103-454, § 103(3), 108 Stat. 4791 (1994), *codified at* 25 U.S.C. §§ 5130, 5131. The "findings" section of the law—which was not codified in the United States Code—includes the following statement: "Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in [P]art 83 . . .; or by a decision of a United States court[.]" 108 Stat. 4791, 4791. In 1995, the Ione Band was included on the list of recognized tribes published by Interior. Indian Entities Recognized and Eligible To Receive Services From The United States Bureau of Indian Affairs, 60 Fed. Reg. 9250-01, 9252 (Feb. 16, 1995). In 1996, the Band held tribal government elections that resulted in Interior's acknowledging the Band's tribal government.

In 2008, Interior promulgated regulations implementing IGRA's provisions governing gaming on lands acquired after the statute went into effect. Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354-01 (May 20, 2008). The regulations limit the "restored tribe" exception to those tribes that have been restored to recognition through (1) an act of Congress, (2) the Part 83 process, or (3) a federal court order. 25 C.F.R. § 292.10. In other words, the restored tribe exception, as interpreted by Interior, does *not* apply to tribes—such as the Ione Band—that were administratively restored outside the Part 83 process either before or after that process was put into place in 1978. In the explanation of its final rules, Interior expressed its "belie[f] that in 1988 Congress did not intend to include within the restored tribe exception [any] pre-1979 ad hoc determination[s]." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed.

Reg. at 29,363. Interior relied, in part, on the fact that the Tribe List Act had not listed non-Part-83 administrative determinations as a possible route to recognition. *Id.*

The 2008 regulations "apply to final agency action taken after" June 19, 2008. 25 C.F.R. § 292.26(b). However, the regulations include a "grandfather" provision:

> These regulations . . . shall not apply to applicable agency actions when, before the effective date of these regulations, [Interior] or the . . . Gaming Commission . . . issued a written opinion regarding the applicability of 25 U.S.C. [§] 2719 for land to be used for a particular gaming establishment, provided that [Interior] or the [Gaming Commission] retains full discretion to qualify, withdraw or modify such opinions.

*Id.* The decision to include the grandfather provision reflected Interior's concern that some tribes "may have relied on . . . legal opinion[s]" issued by Interior or the Gaming Commission

> to make investments into . . . property or taken some other actions that were based on their understanding that . . . land was eligible for gaming. Therefore, [§] 292.26(b) states that these regulations . . . shall not apply to applicable agency actions taken after the effective date of these regulations when the Department or the [Gaming Commission] has issued a written opinion regarding the applicability of 25 U.S.C. [§] 2719 before the

effective date of these regulations. In this way, the Federal Government may be able to follow through with its prior legal opinions and take final agency actions consistent with those opinions, even if these regulations now have created a conflict.

Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. at 29,372.

It is this grandfather provision that Interior invoked in 2012 when it decided that the Band qualified as a "restored tribe." Specifically, Interior determined that the Indian lands determination that the Band had received in 2006 constituted "a written opinion regarding the applicability of 25 U.S.C. § 2719 for land to be used for a particular gaming establishment," so that the 2008 regulations did not apply to the Band's application. Interior then relied on and adopted the 2006 Determination's conclusion that the Band is a "restored tribe" and that the Plymouth Parcels are "restored lands."

According to the County, the 2008 regulations (minus the grandfather provision) carried into effect the *clear* intent of Congress to exclude from the "restored lands of a restored tribe" exception those tribes that were administratively restored to recognition outside the Part 83 process. The County does not dispute that the Band falls within the scope of the grandfather provision, nor does the County challenge Interior's 2006 determinations—adopted and relied on in the ROD—that the Band is a "restored tribe" and that the Plymouth Parcels are "restored lands" under IGRA. But the County argues that, when an agency promulgates a new rule and the agency's pre-rule practice was "inconsistent with

[Congress'] intent," the agency cannot "grandfather in" pending applications unless certain conditions are met. The County relies on *Natural Resources Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1244 (D.C. Cir. 1988), and its test for determining when an agency has a "duty to apply a rule retroactively." Interior's decision to grandfather in the Band does not pass muster under that framework, argues the County, so the grandfather provision of 25 C.F.R. § 292.26(b), as applied by Interior to the band, is contrary to IGRA—that is, is "not in accordance with law." 5 U.S.C. § 706.

The premise of the County's argument is flawed: Congress did not clearly intend to exclude from the "restored tribe" exception those tribes administratively restored to recognition outside the Part 83 process. As Interior recognized in its 2008 rulemaking, "[n]either the express language of IGRA nor its legislative history defines restored tribe." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. at 29,363. "Restored to Federal recognition" certainly *could* mean "restored via the Part 83 process, legislation, or a court order," as the 25 C.F.R. part 292 regulations reflect. But if Congress wanted to exclude those tribes that were administratively re-recognized outside the Part 83 process, it could have done so by explicitly referring to that process, as it did in the exception immediately preceding the restored lands exception. *See* 25 U.S.C. § 2719(b)(1)(B)(ii) ("Subsection (a) of this section will not apply when . . . lands are taken into trust as part of . . . the initial reservation of an Indian tribe acknowledged . . . *under the Federal acknowledgment process*[.]" (emphasis added)). Instead, Congress used the undefined term "restored." Furthermore, Congress used that undefined term knowing that some tribes had been re-recognized outside the

Part 83 process. *See Interstate Commerce Comm'n v. Texas*, 479 U.S. 450, 458 (1987) ("Presumably, in enacting [the statute], Congress was aware of the [implementing agency's] consistent practice of regulating railroads as 'rail carriers' even when they performed Plan II intermodal service."). Given those indicators of congressional intent, we conclude that Congress did not clearly intend for the "restored lands" exception to be unavailable to those tribes administratively re-recognized outside the Part 83 process. Rather, Congress left a statutory ambiguity for Interior to resolve, and Interior reasonably could have determined that a tribe could be "restored" to Federal recognition outside the Part 83 process, at least in certain circumstances.[17]

Because Congress did not clearly intend for the "restored lands" exception to be unavailable to those tribes administratively re-recognized outside the Part 83 process, grandfathering in those tribes would not frustrate congressional intent. Accordingly, even assuming that the principles of *Thomas* apply, Interior's decision to grandfather in the Ione Band under 25 C.F.R. § 292.26(b) was permissible. *See Sierra Club v. EPA*, 719 F.2d 436, 467–68 (D.C. Cir. 1983) ("The statutory interest in applying [a] new rule despite individual reliance is, of course, the crucial consideration in the context of requiring an agency to apply one of its rules retroactively."). In other words, 25 C.F.R.

---

[17] The Tribe List Act suggests that a non-Part-83 administrative "recognition" is not a recognition at all. *See* 108 Stat. 4791, 4791 (listing methods of recognition). Even if a non-Part-83 administrative recognition occurring after the effective date of that statute is invalid, the Band was re-recognized *before* the effective date of the Tribe List Act. Furthermore, Congress' intention in 1994 sheds no light on what Congress meant in 1988 when IGRA was passed. *Olive v. Comm'r*, 792 F.3d 1146, 1150 (9th Cir. 2015).

§ 292.26(b), as applied by Interior in the ROD, is "in accordance with law."[18]  5 U.S.C. § 706.

In short, Interior permissibly grandfathered in the Band's application, and the County does not challenge Interior's determination that the Band falls within the scope of the grandfather provision.  We therefore hold that Interior did not err in allowing the Band to conduct gaming operations on the Plymouth Parcels under the "restored tribe" exception of IGRA.

**AFFIRMED.**

---

[18] To the extent that the County makes a facial challenge to the grandfather provision, that challenge necessarily fails.  *See William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange County*, 695 F.3d 960, 963 (9th Cir. 2012) ("If [the plaintiff's] as-applied challenge fails, then [its] facial challenge necessarily fails as well because there is at least one set of circumstances where application of [the challenged statute] does not violate a taxpayer's procedural due process rights.").